### TEXAS EMPLOYERS' INS. ASS'N v. BURNETT.
### No. 2208.

Court of Civil Appeals of Texas. Beaumont.
June 30, 1932.

Rehearing Denied Sept. 14, 1932.

A. Ludlow Calhoun and Dave Marcus, both of Beaumont, for appellant.

Howth, Adams & Hart, of Beaumont, for appellee.

WALKER, J.

This suit was instituted by J. W. Burnett against appellant, Texas Employers' Insurance Association, in the nature of an appeal from an adverse award of the Industrial Accident Board. Upon the verdict of a jury, judgment was entered in appellee's favor for total permanent incapacity for 401 weeks, less 2 weeks for which compensation had been paid, at the rate of $17.31 per week, with a lump sum settlement on a discount of 6 per cent.

We sustain appellant's assignment that the verdict of total permanent incapacity is without support in the evidence. Where reasonable minds can find from the evidence that the plaintiff's injuries are permanent and totally disable him from performing the usual tasks of a workman in such way as to enable him to procure and retain employment, the rule is, stated affirmatively, that a verdict in his favor on the issues of total permanent incapacity should be affirmed. But, where it does not have such support, the verdict should be set aside. Standard Accident Ins. Co. v. Williams (Tex. Com. App.) 14 S.W.(2d) 1015; Maryland Casualty Co. v. Sledge (Tex. Civ. App.) 46 S.W.(2d) 442. It is also the rule that these issues may be established by the testimony of the claimant alone. Texas Employers' Ins. Ass'n v. Scott (Tex. Civ. App.) 46 S. W.(2d) 348. On the issue of total permanent incapacity, appellee rested his case upon his own testimony and that of his wife, and, though he had medical treatment by three reputable physicians and surgeons, he offered no expert testimony in support of his case. Appellee testified as follows: While assisting in pulling casing out of an oil well, "that is, a well that was drilled for oil, but it was a dry hole," he was struck over the left eye with a piece of pipe and knocked down. He said he was rendered unconscious by the blow, but, if so, that condition lasted only for a moment, for on his own testimony he knew everything that occurred, both before and after the accident. He was carried in an ambulance to a hospital, where he was treated immediately by Drs. Barr and Ledbetter. Appellee was injured and carried to the hospital on Tuesday, and was kept in the hospital "from Tuesday afternoon to Saturday afternoon." He was injured on or about August 26, 1930, and has had no medical attention since September, 1930. As a result of his injuries, the left eyebrow is about an inch higher than the right eyebrow. Directly on the issue of the extent of his incapacity, we quote appellee's testimony as follows:

"Those doctors treated me within thirty days after I was hurt; I was taken right to the hospital and they dressed the wounds right away, the same day. I suffered pain at that time, not as much as I thought I would, though, to have the kind of injury it was. I have since then suffered pain from that. I haven't tried a position of any kind to do steady work since the time of this injury. As to what work I have tried to do since I was injured was, the first thing that I noticed that I wasn't able to do work, why the starter on my car went back on me and I tried to crank my old Ford car, and I hadn't tried it but just a few times until I had to sit down and couldn't do it. Had to get my son to crank my car for me. As to what other work I have attempted to do—just chores, jobs around home. I haven't tried to make a hand at anything. When I would try to do those things —whenever I would try to do anything that I would get warm, that here would feel like someone had hold of it pulling it together, and it pained me, gave me a headache, and I become sick at the stomach, sort of dizzy-like. I can't work when I am that way. The pain is more severe at sometimes than others, whenever I do anything, start to do anything or walk or anything like that, to get hot, it begins to hurt. That condition still exists.

" * * * I said that when I exerted myself or got in warm places I felt a drawing sensation; that is in the region of that scar. The drawing sensation itself isn't numbness; but it just sort of burns or aches like; it is just a burning and aching sensation. The sensation of that flesh around that scar draws and then I become dizzy and most generally it makes me sick at my stomach." (Questions and answers reduced to narrative form.)

After he was injured, appellee worked for a while for the Rolla Products, soliciting orders from the local trade for household products. He testified as follows:

"I do not have any regular hours for work selling these products working for W. T. Rolla. To carry on that work, I carry those products, you know, in a sample case and show these samples to people I call on, and if they should order any of this stuff, why then we deliver it to them and that's about all the work there is attached to that. They sell extracts and spices and toilet articles and different things like that that you use around home. In other words, if you wanted to buy a bottle of hair tonic from me, they might have a bottle of hair tonic for sale. That is

light work. I have not been able to work for them regularly since the time I was hurt. I was in the hospital from Tuesday to Saturday; from the hospital they took me home. I was not in bed at home all the time; I would lay down and sit up around the house. It was two months after that before I attempted to do anything at all. After then about the first thing that I undertook to do was cranking my car. On this W. T. Rolla Products job that I do I have not been able to work full time at that. If I work at it for any length of time—if I am up too long I begin to get tired, you know. It's not a natural feeling at all, but the worry and traveling, you know; sometimes when I come in, why, I'll have pain in my head if I have been out several hours during the day. When I first started to do that work I wasn't really thoroughly able to do it. I had to do it for financial reasons; had to try to do something. I don't remember how many days I worked assisting one of the mail carriers during the holidays; it was—well, something around 6 or 7 days, I think; I'm not sure about that. I wasn't really able to do that work; I had to do that to try to make a living for my family. The effect that work had on me was, when we would work for quite a while before having to go into the office, and I didn't get a chance to rest the same troubles came back on me and my head began to ache and pain me considerable. The colored gentleman that was the regular carrier, he would take the large packages and let me carry the light ones, and sometimes I would wait for him on a corner while he delivered to another place, until I would rest up."

Mrs. Burnett corroborated her husband in the main details of his evidence, but in no particular did her testimony raise a new issue in his favor. Dr. Ledbetter, the X-ray doctor who treated appellee, testified for appellant that there was no indication of an injury to the skull; that, if there was such an injury, the X-ray would show it; that the injury was confined to the scar above the left eye. Two surgeons and physicians, who had charge of his case during all the time he was under medical treatment, testified positively that there was not an objective symptom in his case supporting, to the least extent, the theory of total permanent incapacity, and by their expert testimony showed that the objective symptoms of numbness, etc., testified to by appellee did not indicate, in the least, total, permanent incapacity, and they testified further that there was nothing in appellee's case to indicate that the headaches and dizziness, etc., testified to by him as resulting from his injuries, indicated total, permanent incapacity. But wholly discarding all defensive testimony, and weighing only the testimony of appellee and his wife, the jury's finding of total permanent incapacity was without support. This construction of appellee's testimony follows from the principles of law stated above, and has direct support in the facts of Indemnity Insurance Company of North America v. Judice (Tex. Civ. App.) 40 S.W.(2d) 246, and Security Union Ins. Co. v. Gullett (Tex. Civ. App.) 36 S.W.(2d) 1085.

The evidence was sufficient to raise the issue of average weekly wage and that appellant was the insurer of appellee's employer. The charge satisfactorily submitted appellant's defensive issues, and no error was committed in refusing to submit its requested issues, covered by the main charge.

It was not error to define the term "total incapacity." The definition given has support in Georgia Casualty Co. v. Ginn (Tex. Civ. App.) 272 S. W. 601; Texas Employers' Ins. Ass'n v. Heuer (Tex. Civ. App.) 10 S.W.(2d) 756.

Because the verdict is without support in the evidence, the judgment of the lower court is reversed, and the cause remanded for a new trial.