### HOWELL v. CONTINENTAL CASUALTY CO.
#### No. 10662.

Court of Civil Appeals of Texas. Galveston.
Nov. 11, 1937.

Rehearing Denied Nov. 24, 1937.

Armstrong, Cranford, Barker & Bedford, of Galveston, for appellant.

M. S. McCorquodale, of Houston, and Brantly Harris, of Galveston, for appellee.

Wood & Morrow and M. S. McCorquodale, all of Houston, for appellee on motion for rehearing.

GRAVES, Justice.

This appeal in a compensation case—advanced for hearing in this court, pursuant to rule—is from a judgment of the Tenth district court of Galveston county, entered upon an instructed verdict that had been duly returned denying the appellant any compensation recovery therein sought against the appellee; the substance thereof being this:

"It is ordered, adjudged and decreed that Mildred P. Howell take nothing by reason of her suit and cross-action against Continental Casualty Company. It is further ordered, adjudged and decreed that the award of the Industrial Accident Board of the State of Texas, No. V–10733 on the docket of said Board and styled Loy W. Howell (Deceased), Employee vs. C. S.

Shoolroy, Sales Agent, National Cash Register Company, Employer, Continental Casualty Company, Insurer, be cancelled, vacated, set aside and held for naught. It is further ordered, adjudged and decreed that said Continental Casualty Company, Plaintiff, and Cross-defendant, do have and recover of and from Mrs. Mildred P. Howell all costs in this behalf expended."

As the appellee frankly concedes, the learned trial court granted its motion for such peremptory instruction upon these two conclusions:

"(1) Loy W. Howell, appellant's deceased husband, was an independent contractor, or owner of a sales-agency, and not an employee within the meaning of the Workman's Compensation Act (Vernon's Ann. Civ.St. art. 8306 et seq.) ; (2) the evidence was insufficient to establish that Howell received any injury in the course of employment, which contributed to or caused his death."

Wherefore, the sole question presented to this court is whether or not the granting of the instruction on those two conclusions was error. After careful consideration of this unduly extended record, it is determined that it was, the evidence upon both features raising issues of fact rather than concluding either of them in the appellee's favor.

The statement of facts also is extensive, and since the contract between Loy W. Howell, appellant's deceased husband, and the appellee in his capacity as sales agent, National Cash Register Company, which was in writing, is somewhat at least of a sui generis character, a full copy of it is appended hereto as an exhibit; invoking paragraphs 32 and 33 thereof upon the trial below, the appellee insisted that the terms of this contract alone can be looked to in determining the question of whether Loy W. Howell worked under the direction of Mr. Shoolroy, or that of someone else, hence no parol testimony was admissible upon such issue.

The trial court, however, overruled that contention, permitting not only the introduction of the written contract, but, further, oral testimony in extenso in explanation of the actual working of the Shoolroy organization under the same, and as showing how the parties themselves construed and acted under the written agreement, thereby developing the evidence in the proportions indicated; in this ruling it is thought no error was involved, and that only in that

way can the real meaning and ultimate effect of the contractual arrangement be arrived at; especially so, since both parties stood upon the contract as written, and the oral testimony received was neither offered nor had the tendency to contradict the written agreement, but rather to show in minute detail how the parties construed it and how in the work-out of their detailed business it was performed.

Looking, therefore, at the body of the evidence as so composed in its entirety, this court is constrained to hold, as indicated supra, that in its ultimate reaches and effect this written instrument did not make of the appellant's husband an independent contractor, or owner of a sales agency, as a matter of law, as so held by the court below, but at the least raised the fact issue as to whether or not he was rather an employee of Shoolroy, within the broad meaning of the Compensation Law, that should have been submitted to the jury; indeed, while it is not necessary to go that far, the indicia seem to this court to indicate that the ultimate result of the contractual arrangements between the two parties simply was that Shoolroy bargained for and secured the personal services of Howell in prosecuting his sales-agency business for the National Cash Register Company and in the work-out in effect controlled not only the service itself, but the manner in which it was rendered; in so much as the contract is herein set out in full, it would serve no useful purpose to attempt an analysis or even résumé of its many detailed provisions, since it seems clear that they did not on their face constitute Howell an independent contractor, as a matter of law; so, when the veil is lifted from these rather complicated written details, and the oral disclosures of what was done under them are added, the essential nature of the whole relationship as constituting merely a minutely regulated engagement of personal services as an employee seems to us to become reasonably plain; in short, under all the facts here, the question of whether Shoolroy was both given and in fact exercised control of the details of Howell's work in selling and promoting the sale of National Cash Registers and supplies, appears to us to have been well-nigh reduced to an unescapable inference that he was; for instance, it was without contradiction shown—in addition to all detailed requirements for daily reports, lists of customers, etc., as set out in the written contract—Howell had to attend an instruc-

tion school as to his duties at Shoolroy's Houston office every Saturday, and that he required the joint office the two maintained at Galveston to be kept open from 8 o'clock in the morning to 5:30 in the afternoon each day, and that promptly at 8:30 in the morning, at the warning of an alarm clock he required kept there for that purpose, Howell must leave the office for work on the outside where he must see every prospective customer, and return for that purpose or otherwise see to it that the office was kept open until the stated time of 5:30 p. m.; it would serve no useful purpose to detail further indicia of such ever-present and dominating control by Shoolroy over the details of what Howell was required to do pursuant to the provisions of the written contract, for their name is legion; however, one other contributing detail may be adverted to, and that is the provision of the written contract that either party may terminate it at will; the appellee, in its brief, admits that provision to be susceptible of the indication of the mere relationship of master and servant, but urges that it is only so, "When the right to terminate is used by the employer to place the employee under control as to details of the work, the employee submitting to such detailed control to avoid losing the benefits of a contract in which he did not surrender such right," urging further that Shoolroy did not in this instance use any such right; but the testimony on that feature would, in the opinion of this court, have authorized the jury to find directly the other way— that is, the right to so control was there, and the unremitting exactions of Shoolroy in keeping Howell's time and movements ever under his watchful eye made it plain that to all intents and purposes he was at all times under the alarm clock kind of control in everything he did.

■ Without further discussion, it is held that the question of whether or not Howell was such an employee was for the jury, under such authorities as these: American Indemnity Co. v. Dinkins (Tex. Civ.App.) 211 S.W. 949 (writ refused); Blankenship v. Royal Indemnity Co. (Tex. Com.App.) 95 S.W.(2d) 366, 367; Liberty Mutual Ins. Co. v. Boggs (Tex.Civ.App.) 66 S.W.(2d) 787; Maryland Casualty Co. v. Kent (Tex.Com.App.) 3 S.W.(2d) 414; Maryland Casualty Co. v. Scruggs (Tex. Civ.App.) 277 S.W. 768; Ochoa v. Winerich Motor Sales Co., 127 Tex. 542, 94 S. W.(2d) 416; Shannon v. Western Indem-

nity Co. (Tex.Com.App.) 257 S.W. 522; Scheuing v. Challiss (Tex.Civ.App.) 104 S.W.(2d) 1113; Schroeder v. Rainboldt (Tex.Com.App.) 97 S.W.(2d) 679; Traders' & General Ins. Co. v. Williams (Tex. Civ.App.) 66 S.W.(2d) 780; United States Fidelity Co. v. Lowry (Tex.Civ.App.) 231 S.W. 818; Workmen's Compensation Law, Art. 8309, R.S.1925; Whitfield v. Traders & General Ins. Co. (Tex.Civ.App.) 106 S.W. (2d) 359; Williams v. National Cash Register Co., 157 Ky. 836, 164 S.W. 112.

■■ Likewise, the question of whether or not Howell also sustained a compensable injury in the course of his employment with Shoolroy, sales agent, as his employer, which was at least a producing cause of his death, was also one for the jury under the evidence as a whole; indeed, under the terms of the written contract, the handling and delivering of cash registers being specifically contemplated and provided for as a necessary incident to the employment, it would seem well-nigh indisputable that Howell was so injured; it is undisputed that he and others of the Galveston office force, at the direction of Mr. Schoolroy, unloaded an excessively heavy cash register at Galveston one night, which Mr. Schoolroy had directed Howell to install at Alvin the following morning; that in the effort to do so, Howell undertook to lift more than his strength would stand, suffering a sudden and severe internal strain as the result thereof; that he suffered intensely and continuously throughout the balance of the night; dying early the following morning; that from all the lay and medical testimony relating to that occurrence, his succeeding illness, and death, it was at least a reasonable inference that the cause of his death termed by the doctors "coronary thrombosis," was the receipt of the injury so sustained. While the jury were not limited to the expert testimony of the physicians so received upon this inquiry, it was their province upon all the testimony, both lay and medical, to determine whether or not the injury so detailed was a producing cause of Howell's death. Commercial Standard Ins. Co. v. Noack (Tex.Com.App.) 62 S.W. (2d) 72; Guzman v. Maryland Casualty Co. (Tex.Sup.) 107 S.W.(2d) 356; Georgia Casualty Co. v. Mixner (Tex.Civ.App.) 289 S.W. 420; Maryland Casualty Co. v. Boverie (Tex.Civ.App.) 37 S.W.(2d) 310; Roland v. Employers' Casualty Co. (Tex. Civ.App.) 290 S.W. 895; Security Union Ins. Co. v. Alsop (Tex.Civ.App.) 1 S.W.

(2d) 921; Texas Employers' Ins. Ass'n v. Moore (Tex.Civ.App.) 279 S.W. 516; Texas Employers' Ins. Ass'n v. McGrady (Tex. Civ.App.) 296 S.W. 920; Travelers Ins. Co. v. Carter (Tex.Civ.App.) 94 S.W.(2d) 1221; Supreme Court's notation on writ of error application No. 22239.

Pursuant to these conclusions, the judgment will be reversed and the cause remanded for another trial not inconsistent with the requirements of this opinion.

Reversed and remanded.

PLEASANTS, C. J., absent.

## APPENDIX

"Salesman's Commission Contract
"U. S.          (Regular Line)
          "Houston, Texas.  Aug. 19, 1935.
          "(City)                    (Date)
"Mr. L. W. Howell,
    "(Salesman)

"Having a sales agency contract with the National Cash Register Company, I hereby agree to employ you to sell regular line cash registers and other regular line products furnished by said Company, excepting accounting machines and accessories, in the following territory: (Give complete description)

"All of the counties of Brazoria, Calhoun, Jackson, Matagorda, Victoria, Wharton and that part of Galveston County west of the Trinity Bay.

"On sales made to local chain stores and major oil companies your commission will be based on the commission the agency would have received if the sale had been made by the Chain Store Division.

"This contract is effective Monday, August 19, 1935, on the following condition, viz:

"1. *To obey rules, etc.*  You are strictly to obey all the rules and regulations of this office, be governed by the decisions of said Company and follow such instructions as may be given you from time to time.

"2. *Not to engage in cash register business after cancellation of contract.* For the reason that at conventions and conferences of the sales agents, their salesmen, and officers of said Company and in other ways, you will obtain confidential information regarding the Company's business affairs, its necessities and plans, and the names and requirements of its customers, which it would not be fair nor right to use to its detriment, you agree in part consideration of your employment by me not to engage directly or indirectly for yourself or as the agent or employee of another, in buying, selling or dealing in cash registers, in the territory herein granted for a period of one year after the termination of this contract, without the written consent of said Company and this agreement shall inure to the benefit of the Company. You do also agree in part consideration of your employment by me, and in view of the confidential information regarding the Company's business affairs, its necessities and plans, which you will be in a position to obtain from time to time, that you will on demand assign to said Company, or its successors and assigns, any inventions you may make during your employment by me, which inventions relate to cash or credit registers or adding or other accounting machines, or to devices especially adapted to use as part a of an accounting system, or to processes or apparatus peculiarly adapted to the manufacture of said systems, machines or devices, or to improvements on any of such inventions whenever made by you, and you also agree to sign any papers and do any acts, which may be deemed needful by said Company to secure to it or its successors or assigns any rights relating to such inventions and improvements, including patents in the United States or any foreign countries.

"3. *Rate of Commission.*  During your active continuance as salesman for me under this contract you are to have and receive from me a commission on all cash registers sold for said Company for use in your territory, whether sold by you or by any other person in my employ, or in the employ of said Company, except as hereinafter provided.

"Your commission to be as follows:

"25 per cent (   ) on the list price of the following new registers:

"Class 800 with receipt and detail-strip.
"Class 900.
"Class 1100 except Nos. 1120–T, 1122–T, 1140–T, 1142–T, 1124–T.
"Class 1500.
"Class 1700 except Nos. 1722, 1722–E, 1724, 1724–E.
"Class 1800 except Nos. 1841, 1851.
"Class 1900 except those with No. 2 Printer.
"Class 2000 regular line cash registers.

"Class N–2000 except N–2023½ (9) 1 Dr and those followed by the word 'special.'

"Class 2700.

"Class 2800.

"Class 6000 except 6023½ (9) 1 C.

"Class 7000 with both receipt and detail-strip.

"All of which are for convenience called 'A' Grade.

"23 per cent (    ) on the list price of the following new registers:

"Class 700 with detail-strip, except those followed by the word 'Special.'

"Class 1000.

"Class 1200.

"Nos. 1841, 1851.

"1900 with No. 2 printer.

"Class 5000.

"Class N–5000.

"Class 7000 with either receipt or detail-strip, but not both.

"The N C R Credit File.

"Remington with either detail-strip or receipt.

"All of which are for convenience called 'B' Grade.

"22 per cent (    ) on the list price of the following new registers:

"N–2000 chain store registers N–2023½ (9) 1 Dr, 6023½ (9) 1 C and those followed by the word 'Special.'

"Class 2600.

"Also on the selling price of the following second-hand registers:

"Class 400 receipt and detail printers.

"Class 500.

"726–T–R.

"Class 800 receipt and detail printers.

"Class 900.

"Class 1100 except Nos. 1122, 1142, 1120–T, 1122–T, 1140–T, 1142–T, 1124–T.

"Class 1500.

"Class 1700 except Nos. 1722, 1722–E, 1724, 1724–E.

"Class 1800 receipt and detail printers.

"Class 1900 except Nos. 1914 (2X)–E, 1914 (3X)–E, 1915 (3X)–E Special, 1900 with No. 2 printer or any other Class 1900 followed by the word 'Special.'

"N–2000 except chain store N–2023½ (9) 1 Dr and those followed by the word 'Special.'

"Class 2000 regular line registers.

"Class 2700.

"Class 2800.

"Class 6000 except 6023½ (9) 1 C.

"Class 7000 with both receipt and detail strip.

"All of which are for convenience called 'C' Grade.

"20 per cent (    ) on the selling price of the following second-hand registers:

"Class 300 with detail-strip.

"Class 400 with either receipt or detail printer, but not both.

"Class 700 with detail-strip, except those followed by the word 'Special.'

"Class 800 with either receipt or detail printer, but not both.

"Class 1000.

"Class 1800 with either receipt or detail printer, but not both.

"1900 with No. 2 printer.

"Class 5000.

"Class N–5000.

"Class 7000 with either receipt or detail-strip, but not both.

"N C R Credit files, S. H.

"Remington with either detail-strip or receipt.

"All of which are for convenience called 'D' Grade.

"18 per cent (    ) on the list price of the following new registers:

"Class 700 without detail-strip, except Nos. 722, 722–T, 722–TR, 723–T and those followed by the word 'Special.'

"1722–E.

"Class 4000.

"Class 7000 without detail.

"The N C R Electric Credit System Switchboard and Telephone.

"Remington with neither detail-strip nor receipt, but with printed total.

"On the selling price of the following second-hand registers:

"Nos. 410, 415, 420, 440.

"Class N–2000 chain store registers N–2023½ (9) 1 Dr, 6023½ (9) 1 C and those followed by the word 'Special.'

"Class 2600.

"All of which are for convenience called 'E' Grade.

"14 per cent (    ) on the list price of the following new registers:

"Class one.

"Metal Register Stands.

"This rate of commission also applies to the selling price of the following second-hand registers:

"Class 200 except 211 Sp., 220, 240 Sp.

"Class 300 without detail-strip.

"Class 700 without detail-strip except 722, 722–T, 722–TR, 723–T and those followed by the word 'Special.'

"Class 4000.

"Class 7000 without detail.

"Remington with neither detail-strip nor receipt, but with printed total.

"All of which are for convenience called 'F' Grade.

"10 per cent (    ) on the selling price of new chain store registers:

"M1914 (3—2) 1 Dr.

"Both National and Remington, except 1722–E, N–2000, and 6000 chain store registers.

"On the selling price of the following second-hand or used machines.

"Metal Register Stands.

"All of which for convenience called 'G' Grade.

"In the event it is necessary to refund any portion of purchase price to the customer or where you have been credited or dishonored checks given by customers, it is understood and agreed that your commission account is to be charged back in the proper amount.

"The commission on a second-hand register shall not be more than the rate carried by the same register when sold as new.

"It is understood that the Company shall have the right to fix the amount to be allowed for National Cash Registers or registers of other makes taken in exchange. Commission will not be paid on the amount allowed for National Cash Registers or registers of other makes.

"In all cases where in judgment of the Company an excessive allowance has been made, the commission will be figured on the money difference that would have been paid if the amount the Company deems to be its regular allowance had been made, and you will be charged with your proportion of the excess.

"4. *Commission on registers repossessed.* When the Company repossesses a register, you shall receive commission only on amount of money paid. On Auto-graphic registers you shall receive no commission unless and until one-half of the list price has been paid.

"5. *Allowances for old registers. Excess Allowances.* The National Cash Register Company reserves the right under any sales agency contract with it to fix the amounts to be allowed on exchanges of new National Cash Registers for old or for registers of other makes. Where you make a greater allowance for an old National Cash Register or register of another make, than is designated by the latest price list, I reserve the right to refuse such order.

"6. *Sales through other mediums.* When in the opinion of the Company the general conditions of the business in any part of the United States or Canada necessitate the sale of cash registers by said Company through mediums other than Company offices or regular sales agencies, you hereby waive any claim to commission on any sales so made in your territory.

"7. *Orders subject to Company's acceptance.* All orders taken by you are to be subject to the approval and acceptance of said The National Cash Register Company, as provided in my Sales Agency Contract with said Company.

"8. *Commission on sales made by other agencies and Company salesmen.* You agree not to enter the territory of any other sales agent of said Company for the purpose of selling cash registers, or any other products herein listed, or to endeavor, directly or indirectly to make sales of cash registers or other products for use outside of your territory, but should a purchaser call on you voluntarily and purchase a cash register or any other product listed herein for use outside of your territory you are to receive your proportion of my commission on the money received from such sale. When under like restrictions, as above provided, any other authorized sales agent of the Company sells a cash register, or any other regular line product listed herein, to be used in your territory, your account is to be credited with your commission, less your proportion of the commission paid to the sales agent making the sale. On sales made by or with the assistance of a Company salesman (also on sales made by or with the assistance of any Company representative who enters your territory for the express purpose of closing or assisting

in closing business) your account is to be credited with your commission, less your proportion of the commission retained by the Company. These commissions are subject to the same liability to be charged back against your account in case of non-payment by the purchaser as in other cases. This arrangement applies not only to business procured at the time of the Company salesman's visit, but also to all business subsequently procured by you, the Company salesman, or some one else other than the Company salesman, from concerns previously worked upon by the Company salesman, provided such business is closed within six months from the date of the Company salesman's visit, even though such visit may have been made during the occupancy of this territory by your predecessor.

"9. *Claims for commissions.* All claims for commission on sales of cash registers whether such sales are made by you or others in your territory, and all claims of whatsoever kind are hereby waived by you if not made within one year from date of cancellation of this contract.

"10. *Sub-commissions.* You agree that you will not under any circumstances give any part of your commission to any assistant, local agent, or other person as an inducement for him to assist you in making a sale without permission.

"11. *Absence from territory.* Should you absent yourself from your territory, without giving written notice to me in advance you are not to be credited with the commission of any sales made in your territory during your absence.

"12. *Time of crediting commissions.* Upon receipt by me from The National Cash Register Company of notification of the settlement of an account by cash or notes, you are credited on my books with the amount of your commission on such settlement.

"13. *Commissions to be charged back.* In case the purchaser fails to pay any note and your commission on the sale has been paid or credited to you, the commission on the amount of the unpaid note is to be charged back against your account.

"14. *Orders to be sent to sales agent. Special conditions to be noted on orders.* All orders for cash registers shall be taken on printed forms furnished me by said Company which are to be returned to me immediately after the signature by the purchasers, and all conditions and special agreements shall be noted thereon, it being understood and agreed that said Company shall in no way be responsible for promises or conditions not specified on the orders. No registers or supplies are to be sold for more or less than the list price established by the Company, plus freight or express. If said Company is obliged to make any concessions to customers, or any expense is incurred by a violation of these requirements, the amount thereof may be charged by me to your account.

"15. *Collections.* You are to collect promptly all notes or accounts that may be placed in your hands for collections, whether the sale was made by you or not, and to turn the moneys over to the Collection Department of this office at once.

"16. *Remittances to sales agents.* You agree to make daily remittances to me of all cash received for me or The National Cash Register Company, including money received for supplies sold and repairs made in the manner prescribed by me, and in no event shall you use any sum of money collected for me or said Company to defray your expenses or for any other purpose. In no case and under no circumstances shall you sign my name or said Company's name; but, should a purchaser require a receipt for cash or other payment, you will receipt to him in your own name as salesman.

"17. *Required credit balance.* I reserve the right to retain from the commission now due or hereafter to become due you the sum of Four Hundred and No/100 dollars ($400.00), to be held as deposit and security for good faith on your part, and to protect me against loss by reason of commissions charged back, or any other amount charged against your account. In case of any termination of your employment, no amount shall become due and payable to you thereafter until final account can be stated and until all registers, upon the sale of which you have been credited commissions, are paid in full.

"18. *Legal expense.* All attorney's fees and costs arising upon collection of the prices of registers sold by you or recovering possession of same charged to my account by said Company shall be divided between us, and you are to have charged to your account by me and pay the same proportion thereof as you receive or would receive of the full commission of such sale. In case a cash register is shipped to a purchaser or an order procured by you

and the purchaser makes no payment on same, you are to pay your proportional part of the express or freight charges on the register, on the basis as above stated. You are to pay your own expenses in attending on trials of cases whether you are responsible for the same or not,, if I so elect.

"19. *Expenses.* You are to pay all your expenses, and under no circumstances are you to represent the National Cash Register Company or me as being responsible for same.

"20. *Option of sales agent.* In case of the termination of this contract for any cause, you hereby authorize me to pay and charge to your account your outstanding indebtedness incurred in the management of said territory, but I shall not be called on to pay said indebtedness unless I shall elect to do so and the payment of part of your indebtedness by me shall not raise any obligation on my part to pay the whole of said indebtedness. No assignment of your account or any part of it at any time to be binding upon me unless such assignment is accepted and acknowledged in writing by me, except an assignment to The National Cash Register Company or to a Sales Agent designated by said Company.

"21. In case this contract shall be terminated at any time I shall proceed to collect the notes and open accounts and charge back against your account the commission upon such notes and accounts as I shall be unable to collect, together with your proportional part of the expense of collection. This to continue until a final account can be stated, and no money shall be due you under this contract until such final account can be stated.

"22. *Objections to statements.* It is mutually agreed that all objections to monthly or other statements of accounts rendered by me are waived by you unless written notice thereof reaches me within thirty days after rendition.

"23. *Sample registers.* You agree, while operating your territory outside of your headquarters' town, to carry with you on the road the full line of regular samples required by the Company's decisions.

"24. *Second-hand registers.* You will agree that you will not purchase or deal in second-hand registers on your own account during the continuance of this contract.

"25. *Fidelity bond.* You agree to furnish said Company and me with a fidelity bond in the sum of One Thousand Dollars ($1,000.00) to be issued by a surety company acceptable to the Company and conditioned on the faithful performance of your duties and to indemnify said Company and me from loss by reason of any wrongful act or acts on your part in the position created by this contract. All premiums on this bond are to be paid by you.

"26. *Option to assume office lease and fixtures.* In case this contract shall be terminated at any time, you agree to immediately give or deliver to me or to someone I may designate, possession of the premises you may occupy as an office at that time, and, if I so request, to assign to me or to such person I may designate, any lease you may have on such premises; and on demand you agree to return the office furniture, personal property, records, and fixtures, hereinafter referred to, to me to be by me credited to your account, at my election, regardless of the condition of your account. The price at which such office furniture, personal property, records and fixtures shall be credited or purchased, shall be the reasonable value thereof, but in no case shall it exceed 90 per cent of the last appraised value. Under no circumstances are you to dispose of the office furniture, fixtures or other personal property without first securing my consent to such sale.

"27. *Damage to property.* For any breakage or damage done to my property or to the property of The National Cash Register Company, while in your charge, you are to be held responsible, and all losses sustained by such breakage or damage shall be paid by you.

"28. *List of probable purchasers.* You agree to keep a list of probable purchasers and also a list of users of National Cash Registers in your territory. Both lists to show the name, business and address of the merchant and the user's list to show also the style and factory number of each register in use. You agree to keep both of these lists up to date by revising and adding to same from information to be secured by your daily work in your territory. These lists shall be and remain the property of The National Cash Register Company and shall be delivered by you at any time to an authorized representative of said Company on demand or at the termination of your contract.

218

"29. *Daily reports.* You agree to send me at the end of each day, a list of all persons who were called on during the day by you in the interest of the business; said list to show each person's name, street address, city and business, and a brief statement of the object and result of said call; all to be written on the form furnished by me.

"30. *Contract a personal one.* It is understood and agreed that this contract is a personal one between us, and that the National Cash Register Company is not to be held responsible for the payment of any commissions or charges falling due under it, and all claims of liability of any kind against said Company under this contract are hereby waived.

"31. Your continuance in such agency to end at the option of either party by written notice mailed to the last known address of the other. The cancellation of my contract with The National Cash Register Company automatically cancels this contract.

"32. *Cancellation of contract.* This contract covers all agreements to date between us, and all other contracts or agreements of any kind are hereby annulled and cancelled.

"33. *Other contracts void.* No alterations of or additions to the provisions of this contract are to be binding upon us unless in writing signed by both of us.

"34. *Variations of contract.* This contract is subject to the limitations contained in my sales agency contract with the Company as above referred to, and any amendments thereto.

"[Signed]  C. S. Shookey, Sales Agent
"Accepted 9–26–35
"[Signed]  L. W. Howell, (Salesman)

"EMPLOYMENT NOTICE to agree with this contract MUST be sent to the Sales Department if the BASIS OF PAY has been changed. Send COPY OF ALL CONTRACTS to the Sales Dept.

"The National Cash Register Company
"Galveston Branch
"2217 Avenue C
"Phone 2035.

"William A. Ryan, Sales Agent
"515 Caroline Street
"Phone Capitol 1231
"Houston, Texas.
"July 15, 1935.
"Mr. L. W. Howell,
"Galveston, Texas.

"Please consider this rider a part of your existing sales contract, dated July 12, 1935.

"Rent for the Galveston Office is to be paid by the Company and charged to the Sales Agent's account.

"Taxes on furniture and fixtures, register stock and supplies on hand in the Galveston Office are to be paid by this office and charged to your commission account, as well as the insurance on the above.

"The Repair Department in the Galveston Office is to be supervised by the Houston Service Department and the revenue of this department is to be remitted to the Houston Office. All the repair parts in the Galveston Office are the property of this Agency.

"Expense items of telephone, light and such miscellaneous expense necessary to operate the Galveston Branch are to be paid by you personally.

"All purchases of supplies are to be charged to your current supply account and are to be paid by the tenth of the following month.

"It is expressly understood and agreed that you are to carry in the Galveston Branch Office, as a personal investment, such inventory of cash register supplies as we are required to properly serve the merchants in the Galveston Territory.

"It is further understood and agreed that you are to keep the Galveston Office clean and orderly in accordance with Company specifications. This also applies to Cash Register consignment in the Galveston Office.

"Yours very truly,
[Signed] . C. S. Shookey
"Sales Agent.
"Accepted July 27, 1935.
"L. W. Howell [Signed]
"Salesman."