### AETNA CASUALTY & SURETY CO. v. ISENSEE.

### No. 2794.

Court of Civil Appeals of Texas. Waco.

May 6, 1948.

Rehearing Denied May 27, 1948.

614

Naman, Howell & Boswell, of Waco, for appellant.

Clark & Fisher and Charles Mooney, all of Waco, for appellee.

LESTER, Chief Justice.

This is a suit brought by appellee against appellant under the Workmen's Compensation Law, Vernon's Ann.Civ.St. Art. 8306 et seq., for alleged accidental injuries sustained by his wife in the course of her employment on April 1, 1946, as an employee of the Owens-Illinois Glass Company. The Industrial Accident Board refused to award compensation to the claimant, which was based upon an alleged injury to her lower abdomen, muscles, ligaments, internal organs and possible injury to bony structure. From the decision of the Board appellee appealed to the district court, where he alleged that "on or about April 1, 1946, his wife was working at the Owens-Illinois Glass Company in Waco, Texas, inspecting glass cases that came along a conveyor, it being a part of her duties to remove any cases that had defects to a table and then onto the floor; that on the occasion in question, while she was handling one of said boxes, she suffered a strain in the course of her work and she felt a sudden pain in her abdomen, which caused her to feel sick; that she continued thereafter to have pain in her abdomen, but that she thought she would recover from said trouble and that she continued to work, though she was not physically able to do so, until April 6th; * * * that as a result of said injuries plaintiff's wife continued to suffer severe pain in her abdomen and her condition grew worse until she suffered a miscarriage on May 31, 1946, and as a result of her injuries and the conditions following the same her nervous system was affected, and as a result of her injuries and miscarriage caused by said injuries she suffered an antiflexed uterus and developed a mass in the left culdesac resulting in adhesions and binding of the uterus, particularly on the left side; that as a result of her injuries and the effect of said injuries on her system, said injuries and resulting condition either affected her heart or complicated an existing heart condition from which she did not know she was suffering prior to said injury; that the injuries and resulting conditions herein complained of resulted from said accidental strain and injury on the occasion aforesaid, and said accidental injury was the producing and procuring and direct cause of this plaintiff's wife becoming totally incapacitated for work, and that said total incapacity for work continued from April 1, 1946, for a period of thirteen weeks, and said accidental injuries and the conditions resulting therefrom were a producing cause and procuring cause and a direct cause of permanent partial incapacity to work and

plaintiff's wife has suffered therefrom a permanent partial incapacity to work as hereinafter more particularly shown."

The case was submitted upon special issues and the jury found that Mrs. Isensee sustained an accidental injury to her body, and that she sustained total incapacity to work for 13 weeks and 60% permanent partial incapacity thereafter. Based upon such findings the court entered judgment for appellee for $196 for 13 weeks of total incapacity from the date of said injury, and $625.83 covering partial incapacity to date of judgment, and $9.07 per week from the date of judgment for a period of 231 weeks thereafter.

Appellant contends that the court erred in permitting a recovery for partial incapacity to work in the future, in that said issue was unsupported by medical or other competent evidence; that the heart condition was wholly disconnected from her abdomen injury, and therefore not compensable.

The statement of facts contains approximately 300 pages, which makes it impracticable to set out all the testimony pro and con pertaining to the foregoing assignment.

The rule is that after disregarding all adverse evidence and considering the evidence most favorable to appellee, giving it all reasonable conclusions and inferences that might be drawn therefrom, if such evidence is of sufficient probative force that reasonable minds might differ as to the ultimate conclusion to be reached, it will be held that the evidence supports the judgment. Associated Employers Lloyds v. Self, Tex.Civ.App., 192 S.W.2d 902; Texas Employers Ins. Ass'n v. Moser, Tex.Civ.App., 152 S.W.2d 390; Associated Employers, Lloyds v. Groce, Tex.Civ.App., 194 S.W.2d 103; Great American Indemnity Co. v. Beaupre, Tex.Civ.App., 191 S.W.2d 883.

Mrs. Isensee testified that she was twenty-seven years of age; that she was reared on a farm and had done farm work all of her life until she went to work at the Blue Bonnet Ordinance Plant, where she worked for eighteen months without missing a day; that she had never had any serious illness of any kind and had not been attended by a physician within seven years preceding her injury except when she had a miscarriage about seven years before, and as far as she knew she was strong and healthy up to the time she received her injury. Concerning her injury she testified that she was engaged in assorting cases of empty bottles; that she would take them off of a conveyor, place them on a table, then inspect them in order to remove all defective bottles, and after said inspection re-pack them. She further testified: "Well, at the time this happened we didn't have any trucks available so we stacked up the ware on the floor. Each girl stacked her ware up by the table on the floor. And when they brought the trucks in each girl took her own ware and put the boxes on the truck. And naturally it was stacked up pretty high. It was over my head. And I picked this last box off of the floor and as I picked this box up I felt a pain. Well, it made me sick. I got sick all over; sick at my stomach; and I dropped the box. I just got so sick so I dropped this box and stood up awhile until I felt better; straightened up a little while until I thought I could pick it up again. So I picked the box up and put it on the truck where I was supposed to. And I was real sick at that time and thought I had to go to the restroom and vomit, and so I did go into the restroom and came out and I laid down a minute on a cot; just a few minutes because we were not allowed to stay in there at the time, but I did lay down because I had to. And—well, I went on back on the job and we were on the last hour so there wasn't anything doing but cleaning up. We had finished our work and they were cleaning up. All the girls were cleaning up and I didn't do very much after I went back to work." She further testified that the pain she felt was in her lower abdomen and as she lifted the box and turned was when she felt said pain; that the pain was very severe and when she went to the restroom she discovered she was menstruating and she continued to do so until Wednesday or Thursday and that the flow was more than normal; that she couldn't figure out what had happened but she knew she had done something to herself; that she didn't really know that she was pregnant at the time but she thought she was; that she went back to work the next day and worked through Friday, think-

ing she would be all right, but she continued to feel very bad and had difficulty in performing her work; that the reason she went back to work was that she wanted to keep her job; that on Friday morning she went to see Dr. Howard Dudgeon because she had to have help, knowing that something was wrong; that she was sick and wanted him to examine her and find out what he could find out about it; that he examined her and gave her some medicine of some kind for the pains and cramps she had; that on Saturday she came to town and got her check; that she was still bothered with pains in her abdomen, and went into Penney's Store and after she got upstairs she got to feeling very bad and fainted in the store; that she was in there thirty minutes or longer and that she felt too bad to get anything she wanted, and went on down to Ward's to meet her husband, where he was waiting for her, and while standing there a few minutes she fainted again; that they gave her some water and brought her to, then her husband took her home and she was real sick and went to bed; that she was sick through Sunday and on Sunday afternoon she passed a membrane or something that looked like a piece of skin; that the following Monday night, on April 6th, she went to bed between 8:30 and 9:00 o'clock; that her heart began beating awfully fast and then the beating would check and when it checked she could hardly breathe and couldn't raise out of bed, that it was very painful when she attempted to get up or raise up; that her husband was afraid to leave her alone so he put her in the car and drove into town and phoned the glass company and was instructed to take her to the Providence Hospital and they would have Dr. Crosthwait to come out to see her; that she remained in the hospital for two days, during which time she had some temperature as high as one hundred degrees; that upon leaving the hospital she was sick and stayed in bed practically all the time; that she felt terrible and was very weak; that she started to menstruating a week after she left the hospital, which continued until she miscarried on May 31st, and she remained in bed three weeks thereafter; that she still suffers from pains in her abdomen every month and at times she is

very nervous; that she never suffered from nervousness before the injury. She further testified that since her injury she has always had trouble with her monthly periods; that they are not regular and are lots more painful than they were, that they continue too long and leave her sick and weak from the loss of too much blood.

Her husband, Mr. Isensee, testified that the last day that Mrs. Isensee worked at the glass company was Friday, April 5, 1946; that during the three or four days prior to Friday, April 5th, his wife was hardly able to get around at all because her feet would swell and she felt bad all the time and she was complaining of pain in her abdomen, and that she was having a bloody flow during that period; that on Saturday night she had awful cramps and pains and the next morning she passed a membrane; that after leaving the hospital she went to bed and stayed for many weeks; that during this period she was weak and suffered pain and it was about three months before she could stay on her feet. He further testified about his wife fainting while she was down town on Saturday, April 6th.

Dr. Wilson Crosthwait, who had examined Mrs. Isensee on April 8th while she was in the hospital, was called by appellant and testified as follows:

"Q. Now, Doctor, you say you examined her there then that first day that you saw her? A. I examined her that first day.

"Q. State what kind of examination you gave her at that time. A. I gave her a complete physical examination. Looked at her eyes and listened to her heart and lungs and took her blood pressure, examined her abdomen, and I even did a female examination to determine about her female organs and at that time I found that in my estimation she was about three months pregnant.

"Q. From your examination was there any evidence of any loss of blood? A. There was no evidence of any loss of blood at that time.

"Q. If she had been menstruating, following a strain Monday night, for some three or four days, would there at that time have been some evidence? A. There would have been evidence of blood. You would have seen it. There would also have

been blood in her urine. Your analysis showed there was no blood in her urine.

"Q. She had there a laboratory analysis of the urine? A. Yes.

"Q. At Providence Sanitarium? A. Yes.

"Q. On April 8th, was it? A. That was made on the 9th.

"Q. Made on April 9th? A. She came in on the 8th and the next morning when she voided her urine they carried a specimen to the laboratory and the urinalysis shows there was no blood.

"Q. Doctor, did you take a blood count at that time? A. Yes sir.

"Q. State what the blood count showed please. A. The red blood cell count was 3,570,000 and the white blood cell count was 8,500, and the hemoglobin was sixty-seven per cent, and the differential count, polges seventy-nine per cent and the lymphocites twenty-one per cent.

"Q. Now, Doctor, state just in common every-day language what that means, please. A. This blood count, the white count is normal. That is the average count. The red count of 3,570,000, with 67 per cent hemoglobin you might say is a slight anemia, but that is about the average count of the patients we see women.

"Q. Would there be any such condition of the blood there that would cause a heart condition, Doctor? A. Not in my opinion.

"Q. What was the condition then that you found in her chest, Doctor? A. She had an occasional extra beat in her heart and she had a few rales in her upper left chest.

"Q. And what was your diagnosis? A. My diagnosis was that she had —she had pain when you pressed on her chest, and I thought she had an intercostal neuralgia, which is inflammation of the nerves all around the ribs which was probably a referring pain from something in her chest like a cold or something of that sort.

"Q. What about this extra beat in the heart that you heard? A. Well, this simply was just an extra beat that came on. You may see that in cigarette smokers or sometimes from disease.

"Q. Doctor, when you examined Mrs. Isensee before she went to work out there at the company, to pass her for work, did you examine her heart at that time? A. I listen to all their hearts when I examine them.

"Q. Did you find anything wrong with her heart in that examination? A. I don't recall of course, because I have examined probably three or four thousand, but the record out there shows that I have no comment on her heart.

"Q. If she had had a mitral murmur at that time you, as a competent physician would have found it, wouldn't you? A. If it was present at that time I think I would have."

Dr. Crosthwait further testified that he called in Dr. Brian Aynesworth, a heart specialist, to examine Mrs. Isensee while she was still in the hospital; that he himself was not a heart specialist but a physician and surgeon.

Dr. Brian Aynesworth, called as a witness by the appellant, testified that he first examined Mrs. Isensee at the hospital on April 9, 1946, and diagnosed her condition as inflammation of the pleura and pericardium, which is the covering of the lung and covering adjacent to or next to the heart, which he thought was the result of an infection of some character and he considered it as a passing condition. He made another examination of her sometime between the middle of May and June 4, 1946, and upon this examination, he testified, he discovered that she had a soft presystolic murmur of the left upper valve. He made the following answers to the following questions:

"Q. Isn't it a fact that in your report dated June 4, 1946, you stated that there is a soft presystolic mitral murmur transmitted to the left and upward? A. Yes.

"Q. It was a mild involvement of the mitral valve? A. Quite mild.

"Q. But you know as an expert in that field that a condition of that kind can reasonably be aggravated in time and can get worse? A. Yes.

"Q. And if a competent doctor examined this lady within the last week and testified the condition was serious and much worse

than it was last December, for instance, you just don't know but what that is true; it could be true, couldn't it? A. Yes, it could."

Concerning the loss of blood or anemic condition he testified as follows:

"Q. Was there any indication either at the time of the first examination or the second examination of any loss of blood that would amount to any seriousness at all? A. Do you have this chart?

"Q. Are you asking for the hospital record? A. Yes, sir. When she was in the hospital she had a low red count and low hemoglobin.

"Q. Well, was that within what you would call normal limits? A. No sir, it was below normal.

"Q. Did that indicate to you any serious loss of blood or the need of blood transfusions or anything of that kind? A. Not any need of a blood transfusion, but certainly something should be utilized to build up that blood count. Yes.

"Q. Doctor, you know that one of the things that can account for heart murmur is the loss of blood? A. Indeed it can.

"Q. And if this lady during the period from April 1st for a few days thereafter hemorrhaged and from sometime the middle of April or a little thereafter until the time you examined her in May had been bothered with hemorrhages from her uterus causing an anemia, that might reasonably have contributed to cause this heart condition; that is a fact, isn't it? A. To cause the heart condition?

"Q. I say it might reasonably have contributed to cause it? A. I don't believe it would cause the type of murmur that I heard. The blood count was relatively normal on the day of my examination.

"Q. But the hemorrhaging over that period of time can produce a murmur? A. It can definitely. If a large loss of blood has occurred it can cause a murmur if enough blood has been lost.

"Q. If you lose enough blood? A. Yes."

In reference to his report he testified:

"Q. Now, Doctor, with the exception of this reference to this pre-systolic mitral murmur, this involvement of the mitral valve, does that report show this lady was suffering from any disease or infection or any other trouble of any kind at all? A. Outside. of that?

"Q. Yes sir. A. At that particular time this report does not.

"Q. In other words there is nothing in that report at all to account for this heart condition? A. Would you repeat that question?

"Q. I say there is not anything in the report, no infectious disease shown or any other condition, general physical condition, that would produce or cause or account for this condition of the heart that you found on that examination? A. The only thing in this report that might account for it is in our history the fact that I didn't hear the murmur the first time, and with what I considered a pleuro pericarditis one month previous, then if those factors were grouped then there is something in this report.

"Q. Do I understand you to say that this pleuropericarditis could have caused this heart involvement? A. Not necessarily, no."

Dr. Souther, who had examined Mrs. Isensee in December, 1946, and again on the 10th of October, 1947, was called by the appellee, and testified as follows:

"Q. What did your examination of Mrs. Isensee's heart reveal? A. I found what I thought was a definite mitral murmur.

"Q. What does a mitral murmur indicate? A. It indicates that this was presystolic. My diagnosis was that it was a pre-systolic murmur due to a mitral stenosis because it was transferred into the axillary line.

"Q. Tell us in simple laymen's language just what condition would have existed there in the mitral valve of the heart that would cause that murmur? A. That is where the valve is closing too tightly. It is smaller than it should be and the blood in coming through makes a sound.

"Q. What condition did you find in your last examination with reference to her heart? A. I found her heart in a worse condition than it was before. The pelvic condition seemed to have improved from

some cause, but her heart condition was what I considered considerably worse.

"Q. At the time of this last examination did you believe that her physical condition was serious? A. Yes.

"Q. Doctor, let me ask you one or two more questions. If Mrs. Isensee had not had any rheumatic fever or any pneumonia or any colitis or any of those other infectious diseases that you say might have caused her condition, and if she was examined in January of 1946 to go to work out there and she was found to be in good health at that time, and if she was given a thorough physical examination one week or a little more than one week—I believe it was eight days, to be exact— after the date that she was hurt out at the glass plant, and in that examination no evidence was found of any infectious disease; and assume that the flow and hemorrhage during this period of time after she was hurt out there on the job was more than a normal menstrual period; then knowing that would it be your opinion that the injury caused her condition? A. It would have had to have been enough, a sufficient amount of hemorrhage to have produced anemia and then the blood fail to be re-habilitated. Now it sometimes rehabilitates and gets back to normal after a severe hemorrhage. Usually does.

"Q. But knowing this situation, would you be of the opinion it was the result of the strain? A. I wouldn't say. It could have been had she had that amount of hemorrhage, but I don't know whether it was or not. I don't know how much hemorrhage she had."

Referring to the preceding hypothetical question, the doctor was asked:

"Q. I say, Doctor, assuming all those things that I gave you in the question a moment ago; assume that this was more than a normal menstrual flow; it was a considerable hemorrhage, sufficient hemorrhage to cause this condition; then would you say that it could reasonably have resulted, her heart condition could reasonably have resulted from this injury she received on April 1st? A. As I answered before, it could have been if it was sufficient to produce an anemia.

"Q. It could have been? A. Yes sir, if it was sufficient to have made her anemic. I didn't see her and don't know whether she was anemic or not.

"Q. Now, Doctor, if this lady had, while lifting a box of bottles—I believe the weight isn't in the record yet—but say a box of bottles about 2 feet long or a little less, and about 7 or 8 inches high, and about 15 inches or so wide, empty bottles, in a kind of a little carton or crate, she says she sustained a strain; felt a strain and a pain in the lower abdomen, on the night of April 1st about 11:00 o'clock, when she was working on the shift from 4:00 o'clock in the afternoon until 12:00 at night; and that she went on and stayed on the job, but not doing much that evening until she got at the end of her shift at 12:00 o'clock, but she came back and worked at this same job of standing at a conveyor belt and conveyor table assorting out bottles and picking out defective ones and putting the good ones in cartons, for four days after that, without missing an hour from her work; and then the first pain that she complained of in the chest was when a sudden attack came when she was lying in bed on the night of April 8th, one week after this time when she says she was lifting this box and had a strain of the lower abdomen; you wouldn't associate her condition with the abdominal strain, would you? A. Not unless she had lost a sufficient amount of blood to render her anemic. Then it could have been. I don't know how much blood she lost during that four days."

To a hypothetical question Dr. Souther testified that the injury Mrs. Isensee sustained on April 1, 1946, could reasonably have been the cause of her miscarriage if it was a separation of the placenta, and concerning her pelvic condition he testified as follows:

"Q. Did you examine the pelvic region or female organs? A. Yes sir.

"Q. What did your examination disclose, Doctor? A. Well, I found a displaced uterus, that is, an anteversion; what we call an anteverted uterus, and a mass in the culdesac; small mass in the culdesac. I don't know what it was, but there was a small mass there at the time I examined it and the uterus was anteverted.

"Q. The condition of the anteflexed uterus is a very common condition among women who have had children or have had miscarriages; that is correct, isn't it?. A. Yes, very common. .

"Q. It is not a condition that you associate with an accident or injury at all, is it? A. No sir, not necessarily.

"Q. Now this mass that you found, the little mass you say, that wouldn't be caused by an accident would it? A. No, the mass wouldn't be caused by an accident.

"Q. That is a result usually of an infection? A. Infection, and could be caused from a miscarriage or infection either in the tube or the ovary or it could be a cystocoris.

"Q. Doctor, is this pelvic condition you speak of permanent? A. Yes, it is permanent.

"Q. Now with reference to the heart condition, Doctor, is that condition permanent?. A. Yes, I think that condition is permanent."

Dr. D. D. Warren, who had examined Mrs. Isensee in April, 1947, was called by the appellant, and testified as follows:

"Q. Now, Doctor, you described this condition that you found as a chronic mitral valvular heart disease. What was it that you heard or saw or could feel in your examination that caused you to reach that conclusion? A. All right. In an acute valvular disease there are changes in the electrocardiagram which will point toward an acute affair. That was not present as it should have been, and then actually the grade of the murmur is different. The heart sound is different in an acute condition from a chronic condition.

"Q. Then, Doctor, what did you find as a result of that examination? A. The only positive finding I found was a soft presystolic murmur at the cardiac apex, indicative of an old rheumatic heart lesion, in the valve of the heart, of rather low grade; what we call a grade one.

"Q. Doctor, did you know that at the first time this lady's heart condition was diagnosed she was suffering from an anemia? A. Yes, I do know that.

"Q. Now if this lady did not have a streptococcic infection at that time then there wouldn't be anything in your examination or in the history to account for this condition, would there? A. She gave a history of repeated sore throat.

"Q. Yes, but I say if she didn't have the streptococcic infection? A. Yes, if you can prove she didn't have any streptococcic infection at any time then I—it would be pretty hard to explain that murmur in her heart.

"Q. You just wouldn't know why it was there? A. That is right."

. Concerning Mrs. Isensee's nervousness, Dr. Warren testified:

"Q. I believe you testified, Doctor, that you attributed the symptoms the lady had when she came to you for examination to nervousness. A. That is right.

"Q. She did appear to be quite nervous? A. Yes sir.

"Q. Would it be reasonable, Doctor, to say that that nervousness might have come on as a result of an injury in her lower abdomen that caused a bleeding from the uterus and thereafter resulted in a miscarriage? Could that have upset her nervous system and caused nervousness? A. Yes, it could do it.

"Q. And, Doctor, if after this miscarriage and down to the present time this lady was bothered with pain in her abdomen and with irregular menstrual periods, periods staying longer than what is generally considered to be normal, that would account for this nervousness? A. Yes, that is true.

"Q. Doctor, you do know that one of the most common aftermaths of a miscarriage is nervousness, don't you? A. Well, it is a common aftermath to a great many things. I wouldn't—I don't believe that you could single out nervousness as being caused from a miscarriage. Nervousness can cause a miscarriage.

"Q. Well, I don't mean to single it out necessarily, but you find after miscarriage that women frequently are nervous? A. Yes, frequently are; but they frequently go ahead and conceive again in the next month or so, showing that they are not any more nervous than the average type of woman.

"Q. Well, that is in some cases? A. That is right.

"Q. And in other cases the result would be extreme nervousness? A. That is right.

"Q. Well, if the lady was bothered with a bleeding from the uterus for about five weeks before she miscarried and then did have a miscarriage, the effect of that might reasonably be a damage to her nervous system, might it not? A. Yes, and then the nervousness might cause the bleeding also. It may come either way; frequently does. It starts a vicious circle. Bleeding makes them nervous and nervousness makes them bleed."

The foregoing evidence discloses directly, or by reasonable inferences, if accepted by the jury as true, that Mrs. Isensee was a young, strong, healthy woman at the time of her alleged injury; that she was reared upon a farm and was able to and did farm work most of her life up until two years prior to said injury; that she was in a state of pregnancy at the time and was engaged in stacking cartons of empty bottles, weighing from twenty to twenty-two pounds; that the stack of cartons at the time was higher than her head when standing, and she says that while she was in the act of lifting the last one she felt a severe, sudden pain in her lower abdomen that caused her to drop the carton; that she immediately began an abnormal hemorrhaging which continued for three or four days; that she suffered severe pain for some time thereafter and the Saturday following she fainted twice; that the following Monday night she was carried to the hospital suffering severe pains in her heart, and about a week thereafter she started an abnormal hemorrhage again that continued until she miscarried on May 31st. She was given a physical examination the preceding January 21st by a competent physician and no heart trouble was discovered, and he again examined her at the hospital on April 8th and did not detect any heart disease. Dr. Brian Aynesworth, a heart specialist, also made an examination of her at the hospital and he did not find any heart trouble, but some two or three weeks later he examined her and diagnosed her condition as having a mild mitral murmur. Dr. Souther examined her in December, 1946, and found that she was suffering with a mitral murmur of the heart. Dr. D. D. Warren examined her in April, 1947, and made the same diagnosis in that he detected what he termed a soft presystolic murmur. Dr. Souther made another examination in October, 1947, and found that her heart was in a worse condition than before and that he was of the opinion that she was in a serious condition. He was very positive in his testimony to the effect that this condition could have been brought about by her abdominal injury if she had lost enough blood to produce anemia. Dr. Aynesworth testified that Mrs. Isensee's heart condition could be easily aggravated in time and become worse; that when she was in the hospital her red blood count was below normal and that "certainly something should be utilized to build up her blood count," and that a large loss of blood could definitely cause a heart murmur. Dr. Warren testified that he knew that at the first time Mrs. Isensee's heart condition was diagnosed she was suffering from anemia and when he examined her she was quite nervous. In all of the examinations made of Mrs. Isensee there was no finding that she had at that time or had had in the past any infectious disease.

The jury had a right to take into consideration all the evidence, both medical and non medical, so we are of the opinion that it was the province of the jury to determine whether her present heart condition is the result of her injury received on April 1st, or if she was suffering from a heart condition at the time of her injury, that such condition was aggravated as a result thereof. Aside from her heart condition there is evidence that she was still incapacitated to some extent at the date of the trial as the result of her abdominal injury. She testified that she still had pains in her abdomen; that her monthly periods were irregular and that they were much more painful than before, that they lasted longer and left her sick and weak from the loss of too much blood; that since her injury she was very nervous; that these conditions did not exist prior to her injury. Dr. Souther testified that when he examined her he found a displaced uterus with a mass in the culdesac; that it should not have been there and that it was an abnormal condition; that it could be caused by a pus tube or could be a cystocoris or could be caused

by many things, including a miscarriage; that he considered it a surgical case and told her that was the only thing that would give her any relief, that medicine wouldn't do her any good; that it might be that one surgeon would operate and another wouldn't for such condition; that such pelvic condition was permanent.

Appellant cites four cases to sustain its contention that the evidence does not support the judgment: Texas Employers Ins. Ass'n v. Burnett, Tex.Civ.App., 52 S.W.2d 771; Indemnity Ins. Co. of North America v. Judice, Tex.Civ.App., 40 S.W.2d 246; Security Union Ins. Co. v. Gullett, Tex. Civ.App., 36 S.W.2d 1085; General Life Ins. Co. v. Potter, Tex.Civ.App., 124 S.W. 2d 409. We have read each one of said cases but do not believe they are in point here.

In respect to medical opinion testimony we refer to a recent case by the Supreme Court, Hood v. Texas Indemnity Co., Tex. Sup., 209 S.W.2d 345, 346, points 1 and 3, from which we quote:

"The decision of the Court of Civil Appeals is based solely upon its interpretation of the opinion testimony of Dr. Cline a witness for respondent. That character of testimony is but evidentiary and is never binding upon the trier of facts. The trial judge would have been well within his province in rejecting all of the theories of Dr. Cline and in adopting the theory of petitioner's witnesses. He chose to adopt the general theory of Dr. Cline, but by so doing it does not follow that he was bound to adopt all of his conclusions. He could adopt them in part and reject them in part."

and held that opinion testimony does not establish any material fact as a matter of law. See also: Associated Employers Lloyds v. Self, Tex.Civ.App., 192 S.W.2d 902; U. S. Casualty v. Vance, Tex.Civ.App., 91 S.W.2d 465; Howell v. Continental Cas. Co., Tex.Civ.App., 110 S.W.2d 210; Carter v. Travelers Ins. Co., 132 Tex. 288, 120 S.W.2d 581; American General Ins. Co. v. Smith, Tex.Civ.App., 163 S.W.2d 849.

■■ Appellant contends that the trial court erred "in refusing to separate, by submission of special issues to the jury, incapacity resulting from alleged injury to lower abdomen and that resulting from a heart condition, which was not a compensable injury." The court submitted to the jury Special Issue No. 1, to-wit: "Do you find from a preponderance of the evidence that Mrs. Isensee sustained an accidental injury to her body on or about the 1st day of April, 1946?" to which the jury answered "Yes." Appellant objected to the court's charge because it did not separate the incapacity, if any, resulting from the alleged injury to the lower abdomen, and her heart condition; that the heart condition, under all of the evidence and the great preponderance of the evidence, was not a compensable injury; and tendered to and requested the court to give its special issue No. 1, to-wit: "Do you find from a preponderance of the evidence that the heart condition of Mrs. Isensee is not the result of an accidental injury? Answer 'It was the result of an accidental injury' or 'it was not the result of an accidental injury.'" The court refused to give said issue and appellant also assigns such refusal as error, but does not cite any authorities to sustain either proposition.

Appellee based his suit for compensation upon allegations of general injury sustained by his wife. We are of the opinion that the court took the proper action in refusing to submit separate issues in respect to her heart condition and her abdominal injury. The form of the issues as submitted by the court has been upheld by the appellate courts in many cases. Southern Underwriters v. Boswell, 138 Tex. 255, 158 S.W.2d 280; Employees Lloyds v. Schott, Tex. Civ. App., 183 S.W.2d 262, 263; Traders & General Ins. Co. v. Wright, Tex. Civ. App., 144 S.W.2d 626.

As to the requested issue, we are of the same opinion. The appellee pleaded a general denial only. The requested issue was not a controlling issue in the case. If it had been submitted and the jury had made an answer favorable to appellant, it would not have formed any basis for a judgment in its favor. Rules 94 and 279, Texas Rules Civil Procedure.

We have examined all of appellant's assignments and are of the opinion that each should be overruled.

Finding no reversible error, the judgment of the trial court is therefore affirmed.

HALE, J., took no part in the consideration and disposition of this case.