## THOMPSON v. BROWN.

### No. 2856.

Court of Civil Appeals of Texas.
Waco.

July 7, 1949.

Rehearing Denied Aug. 8, 1949.

Taylor & Dickens, Marlin, Kelley, Mosheim & Ryan, Houston, for appellant.

Jones, Jones & Brian, Marshall, Woodie M. Zachry, Waco, for appellee.

TIREY, Justice.

Herman E. Brown, a brakeman, brought this suit for damages as a result of personal injuries sustained by him by reason of a derailment of the freight train on which he was riding while engaged as head brakeman. The jury's verdict was favorable to plaintiff and awarded him $25,000.00 damages. The judgment followed the verdict and defendant has perfected its appeal.

The cause of action is grounded on three counts: (1) a plea of res ipsa loquitur; (2) a violation of the Federal Safety Appliance Act, or Boiler Inspection Law, 45 U.S.C.A. § 23; and (3) negligence on the defendant in its failure (a) to keep the roadbed in repair; (b) that the locomotive was operated at a high and excessive rate of speed, and (c) at a speed in excess of that fixed by the applicable operating rules of defendant. Each of these counts was denied by appropriate pleading and defendant specially pleaded that the derailment was the result of an unavoidable accident and, in the alternative, specially pleaded contributory negligence on the part of plaintiff (a) in failing to call the attention of the conductor to the fact that the train was being operated in excess of forty-five miles per hour, and (b) in failing to take immediate action to get the train under safe control.

Evidence was tendered to the effect: That appellee's crew took over the operation of the train at Mart, Texas, at 2:20 P. M. on December 8, 1947; on leaving Waco it was comprised of two cars containing cement and one water car and caboose; six miles north of Waco it was derailed at 5:10 P. M. of the same day; the engine and tender left the tracks but did not turn over; two cement cars and the caboose left the track and fell on their sides; the track was torn up for about 670 feet; the inspection report (engineer Russell) of November 26, 1947 stated that the engine involved was "riding very rough, take up slack between the engine and tank"; on December 7, 1947 engineer Russell reported at Houston the same engine was "riding very rough, take out slack between the engine and tank"; on December 8th, approximately three hours before the derailment, engineer Carter reported at Mart "slack bad between engine and tank" and engine foreman Humbert noted on the report "eng (engine) through service no repairs made"; that the slack between the tender and the engine and the rough riding would not interfere with the safety of the locomotive and that there was nothing wrong with the engine

and that some locomotives rode rougher than others; a farmer (while at work), whose land was adjacent to the track near the point of the accident, had been observing the trains as they came along for about two weeks before the wreck, and he said: "They looked like they rocked, the train rocked."; his son went to the scene of the wreck immediately after it happened; he saw some broken rails, the torn-up track and some decayed ties; that the gauge of the road was correct; that the roadmaster had inspected this particular track the day before and that it was in good condition; that the rails were 90 pound rails and that the ballasting was in good repair; that the track at the point of the derailment had been ballasted and built up since the derailment and that the level of the track had been raised about 2½ inches and that some of the ties were changed in the course of that operation.

Appellee said that just out of Mart he was riding on the deck of the engine and the engine was swaying from side to side and he said to the engineer and fireman, "What's the matter with this thing? * * * After it throwed me down twice I told the fireman there was something wrong with this engine. I couldn't get what he said, but he laughed, and I told him 'I am going to get back here and ride on the sand box.'" After that he rode on the sand box until they stopped and set out some cars at the gravel pit before reaching Waco. Both the fireman and engineer said that no such conversation took place; that the engine was not swaying and that Brown was not thrown down. Appellee said that after setting out some cars in Waco and taking on two cement cars from the Cotton Belt Railroad he rode in the cupola of the caboose on the right side, with his back against the window frame, and that the conductor and rear brakeman were with him. With reference to the speed of the train before the accident appellee said: "* * * the further he went the faster he got, and the caboose began to weave back and forth. * * * We had been talking about getting to Fort Worth. There was a passenger train due out of there at 7:20. * * * Mr. Sadler made a remark, I remember he said—he looked

at Dummy (the conductor), he said, 'Dummy, how would you like to hit the ground about now?' and the conductor told him to shut up, 'I don't want to be getting one of these sacks of cement in my lap.'" That when this conversation took place the train was traveling at between 55 and 60 miles per hour and that the wreck occurred about one minute after the conversation. Both the conductor and brakeman said there was no such conversation, that the caboose was not swaying and that the train was not running in excess of 45 miles per hour. The engineer said that he was not running in excess of 45 miles per hour and that he had no thought of speeding up his train so as to try to get to Ray Yards at Fort Worth before the passenger train left at 7:20 in order to make an hour or two of extra time. Appellee said: "The caboose started jumping up and down and I looked out and there was fog and dust, and the cars were jumping up, and the conductor yelled something, I think he yelled, grab something, but I couldn't find anything to grab, and the last thing I remember I was getting up like this * * *. Before the caboose turned over the cars were jumping up and down and I looked up ahead, it all happened in a fraction of a second, and these cars in front of us were turning, and that was when I was hunting for something to grab hold of. The next thing I remember the caboose reared up and fell over and when that dust cleared up I was in the cupola with my back against the top of the caboose, in kind of a sitting position. * * * I was sitting in that position with my back against the top. * * * The best I remember it kind of whirled us over, it was kind of a black-out. * * * My back was against this grab iron at the top of the cupola"; that the grab iron was situated at the top and side of the cupola; that after the caboose stopped its movement "the conductor crawled out and he says, 'Let's get out of here' and when I tried to move I couldn't move. * * * Frank Sadler and I believe the fireman got back in there and helped me out. * * * I held on to this cat walk on top of the caboose, I had to bring one of my legs up and ease on around, and I held on to the caboose." This testimony was denied by both the con-

ductor and the other brakeman in the cupola at the time. It was without dispute that there was an air valve in the cupola of the caboose which would enable the conductor, or any employee in charge of the train, to put on the air in an emergency, that the conductor could signal the engineer that the train was running too fast, and if he thought it was, in such cases it was his duty to do so. It was not contended that the conductor gave any such signal to the engineer, nor that appellee asked him to do so. All of the members of the train crew except appellee said that the train was not running in excess of forty-five miles per hour, and that they did not know what caused the derailment of the train. Conductor Thompson testified in part as follows:

"Q. You have been asked whether you know what caused the derailment. Trains are not in the habit of getting off the track? A. No, sir, I don't think so. * * *

"Q. You know something has to go wrong with the engine for the engine to leave the rail unless there is some cattle on the track or a head-on collision? A. Yes, sir.

"Q. Some defect? A. Yes, sir."

The brakeman on duty is subordinate to the conductor; the general direction and the governing of the train is vested in the conductor and all persons employed on the train must obey his instructions; that under instructions of the railroad company the train in question was not to be operated at a rate of speed in excess of 45 miles per hour; that under the rules of the railroad company in force at the time, if the brakeman observed that the train was being operated at a rate of speed in excess of 45 miles per hour, it was the duty of the brakeman to call it to the attention of the conductor.

The trainmaster was at Mart at the time the accident happened and he went immediately to the scene and made some observations and a memorandum of what he saw.

"Q. As you went up the track and got to where there was some evidence of where the wreck started on the track what did

you see there with reference to the rails and ties and track? A. Where the derailment first occurred the left or west rail was turned over and there was a mark down the web of the rail indicating something had passed over it and I presumed it to be the flange of the engine. There was a mark on the right rail that would indicate a heavy large object had struck the rail and bent it and kinked it, I presumed this to be the counter-balance of the main driver on the right side. For two rail lengths on the west side there was marks down the web of the rail, and then the track was torn up for approximately 670 feet * * * and the engine was stopped standing upright at approximately five pole lengths (north) of the point where there were flange marks or some marks on the web of the west rail. * * *

"Q. These rails that were turned over, was there anything on the ground to indicate whether the rails that were turned over slipped or moved north or south or had moved at all? A. No, the rail turned over to the left. There was no indication of a movement to the north that I could tell.

"Q. About how far north of this first evidence of the derailment did the caboose stop? A. I didn't make a measurement with the tape, but I judge it to be approximately 180 or 190 feet or one pole and a half from the point where the first indications were there where the caboose came to rest on its right side.

"Q. Did you see out there anywhere any broken rails and if so where were they? A. The track was torn up completely for two rail lengths, where there was a mark on the web of it they were torn up entirely.

"Q. Were the rails thrown to the side? A. Yes, sir, they were all torn up. * * *

"Q. Are you able to tell the jury at this time what caused the wreck? A. No, sir."

Section 23, 45 U.S.C.A., commonly known as the Federal Safety Appliance Act, or Boiler Inspection Act, provides:

"Section 23. Use of unsafe locomotives and appurtenances unlawful; inspection and tests.

"It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 28, 29, 30 and 32 of this title and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for. Feb. 17, 1911, c. 103, § 2, 36 Stat. 913; Mar. 4, 1915, c. 169, § 1, 38 Stat. 1192; June 7, 1924, c. 355, § 2, 43 Stat. 659."

The court's charge and the jury's answers pertinent to this discussion are:

"Special Issue No. 1: Do you find from a preponderance of the evidence that the locomotive in question, its tender, or any part or appurtenance of the same, was on the occasion of the derailment in question, in improper condition and unsafe to operate in the service to which it was put so that the same could not be employed in active service without unnecessary peril to life or limb? Answer 'Yes.' * * *

"Special Issue No. 2: Do you find from a preponderance of the evidence that the employment of the locomotive, its tender, or any part or appurtenance thereof in the active service of the defendant under the conditions inquired about in special issue No. 1, if you have so found, was a proximate cause of the injury of the plaintiff? Answer 'Yes.'

"Special Issue No. 3: Do you find from a preponderance of the evidence that the derailment in question occurred by reason of the negligence of the employees of the defendant, other than the plaintiff? Answer 'Yes.' * * *

"Special Issue No. 4: Do you find from a preponderance of the evidence that such negligence, if any, as inquired about in Special Issue No. 3 was a proximate cause of the injuries of the plaintiff? Answer 'Yes'.

"Special Issue No. 5: Do you find from a preponderance of the evidence that the defendant permitted the roadbed over which the train was being operated immediately before the derailment in question to be in a bad state of repair? Answer 'Yes.' * * *

"Special Issue No. 6: Do you find from a preponderance of the evidence that the conduct of the defendant in permitting such roadbed to be in a bad state of repair, if you have so found, was negligence? Answer 'Yes.' * * *

"Special Issue No. 7: Do you find from a preponderance of the evidence that such negligence of the defendant in permitting such roadbed to be in a bad state of repair, if you have so found, was a proximate cause of the injury of the plaintiff: Answer 'Yes.'

"Special Issue No. 8: Do you find from a preponderance of the evidence that just before the derailment in question, the locomotive of the train on which plaintiff was riding was being operated at a rate of speed in excess of 45 miles per hour? Answer 'Yes'. * * *

"Special Issue No. 9: Do you find from a preponderance of the evidence that the operation of such locomotive in excess of 45 miles per hour, if you have so found, was negligence? Answer 'Yes'. * * *

"Special Issue No. 10: Do you find from a preponderance of the evidence that such negligence, if any you have found in Special Issue No. 9, was a proximate cause of the injury of the plaintiff? Answer 'Yes.'

"Special Issue No. 11: Do you find from a preponderance of the evidence that the injury of the plaintiff on the occasion of the derailment in question was not the result of an unavoidable accident? Answer 'It was not an unavoidable accident.'

"Special Issue No. 13: Do you find from a preponderance of the evidence that plaintiff failed to call the attention of the conductor to the fact that the train was being operated at a rate of speed in excess of 45 miles per hour, if it was being so operated? Answer 'No.' * * *

"Special Issue No. 15: Do you find from a preponderance of the evidence that the failure of the plaintiff to call the attention

of the engineer to the fact that the train was being operated at a rate of speed in excess of 45 miles per hour, if you have so found it was, was contributory . negligence? Answer 'No.'

"Special Issue No. 16: Do you find from a preponderance of the evidence that the plaintiff failed to take immediate action to reduce the speed of the train to 45 miles per hour? Answer 'No.' * * *

"Special Issue No. 18: What amount of money, if any, do you find from a preponderance of the evidence, should be deducted from the damages, if any, found by you in answer to Special Issue No. 12, by reason of the contributory negligence of the plaintiff? Answer 'None'."

Appellant's first and second points are substantially to the effect that the court erred in submitting special issues Nos. 3 and 4 because (1) such issues were too general and amount to a general charge and thereby· allowed the jury to consider any act of defendant's employees as negligence; (2) that the issues embraced in Issues Nos. 3 and 4 were specifically made in other issues, which resulted in a dual submission of plaintiff's case, and by reason thereof placed an undue emphasis on the issues.

■ Our view is that because of the pleadings of the appellee and the testimony tendered that said points have been foreclosed against appellant's contention. In Honea v. Coca Cola Bottling Co., 143 Tex. 272, 183 S.W.2d 968, 969, 160 A.L.R. 1445, our Supreme Court said: "Res ipsa loquitur is a rule of evidence whereby negligence of the alleged wrongdoer may be inferred from the mere fact that the accident happened, provided (1) the character of the accident and the circumstances attending it lead reasonably to the belief that, in the absence of negligence, it would not have occurred, and (2) the thing which caused the injury is shown to have been under the management and control of the alleged wrongdoer." Citing Washington v. Missouri· K. & T. R. Co., 90 Tex. 314, 38 S.W. 764; Texas & Pacific Coal Co. v. Kowsikowsiki, 103 Tex. 173, 125 S.W. 3; Wichita Falls Traction Co. v. Elliott, 125 Tex. 248, 81 S.W.2d 659.

■ But appellant says that it is supported in its contention by the doctrine announced in Dallas Railway & Terminal Co. v. Bishop, Tex.Civ.App., 153 S.W.2d 298, and Dallas Railway & Terminal Co. v. Boland, Tex.Civ.App., 53 S.W.2d 158, and Ellis v. Lewis, Tex.Civ.App., 142 S.W.2d 294, and other authorities in its brief cited. We have read each of these cases and we find that in none of them was the doctrine of res ipsa loquitur raised, nor do we think they are applicable to the case at bar. When res ipsa loquitur is pleaded and plaintiff, in the alternative, ·relies on specific acts of negligence and tenders evidence supporting these respective counts, this brings the cause of action within the rule tersely stated in Wichita Falls Traction Co. v. Elliott (opinion adopted by S.Ct.), supra. In that case we find this statement [125 Tex. 248, 81 S.W.2d 666]: *"As stated in 45 C.J. p. 1225: (1) 'Where the presumption arising by virtue of the doctrine of res ipsa loquiture is of negligence generally, as under a general allegation of negligence, the application of the doctrine requires defendant to rebut or overcome the inference that the injury complained of was due to any negligent act for which he is chargeable; (2) However, where the scope of the presumption is limited by specific allegations of negligence, defendant's burden is merely that of showing that he was · not negligent in respect of that particular with which he is charged."* (Numbering and Italics ours.)

■ Applying the foregoing rule to the case at bar (1)· appellant was required to rebut or overcome the inference that the injuries sustained by appellee were due to any negligent act which resulted in the derailment of the train. It is true that defendant undertook to do just that and it contends that it carried this burden by ·a great preponderance of the evidence. With this contention we cannot agree. The evidence we have detailed is a complete answer to appellant's contention. See authorities discussed by Mr. Justice Taylor in the Elliott case, supra, points 2-7 inclusive. (2) With reference to. specific negligence charged resulting in the derailment of the train and resulting injuries to appellee, appellant's burden was only to

show that it was not negligent in the respect of each of the specific charges made. Appellant makes the same contention on this phase of the case, but we are forced to disagree because of the evidence tendered.

▪ Appellant undertakes to point out the distinction between the case at bar and Gulf, C. & S. F. R. Co. v. Dunman, Tex. Com.App., 27 S.W.2d 116, 72 A.L.R. 90, Tyreco Refining Co. v. Cook, Tex.Civ.App., 110 S.W.2d 219, and Honea v. Coca Cola Bottling Co., supra. We are not in accord with appellant's views. We cannot discuss them all. In the Honea case appellant says: "All the court does hold is that the defendant would be entitled to a general issue of the defectiveness of the bottle and a special issue on overcharging. The opinion cannot be interpreted to permit a charge so general under the doctrine of res ipsa loquitur as to allow a dual submission of the special issue on overcharging." We do not so understand the opinion. It says: "Respondent contends that res ipsa loquitur cannot be applied to show any negligence on its part because petitioner's specific allegations of negligence are based entirely on an overcharging of the bottle with carbonic gas, thereby limiting the issue to that allegation and excluding any finding of negligence on the ground that the bottle was defective, which is equally as reasonable an inference as that the bottle was overcharged. *We are not in accord with that proposition. Petitioner was careful to give notice in his petition that he did not propose to be bound by his specific allegations of negligence but would rely on 'general allegations' as to the explosion and the 'defectiveness and the overcharging of said bottle.'*" (Italics ours.) Citing Elliott case, supra. Our view is that the plaintiff's pleadings and the evidence tendered brings this cause of action squarely within the above doctrine, and that appellant's position that Issues Nos. 3 and 4 resulted in a dual submission and undue emphasis of the plaintiff's case is contra to the settled rule announced by our Supreme Court.

▪ Appellant's 3rd, 4th and 5th points say in effect that the court erred in submitting Special Issues Nos. 1 and 2(a) because the evidence was insufficient to warrant the submission of such issues, and (b) because the submission of these issues was so against the great weight and preponderance of the evidence as to be manifestly unjust. Appellant, by its 6th, 7th, 8th and 9th points, makes this same complaint with reference to the submission of Issues Nos. 5, 6, 7, 8, 9 and 10. We overrule each of these contentions.

▪ It will be observed by a reading of the issues that Issues Nos. 1 and 2 submitted a violation of the Boiler Inspection Law; Issues Nos. 3 and 4 submitted the res ipsa loquitur evidence rule; Issues Nos. 5, 6 and 7 submitted specific charges that the roadbed was in bad repair; and Issues Nos. 8, 9 and 10 submitted the specific charge that the train was being operated in excess of 45 miles per hour. We have carefully read all of the testimony tendered in this record (500 pages), and we think each of the issues was tendered. In 17 Tex. Jur. sec. 410 et seq., pp. 909, 910 and 911, we find this statement: "If, discarding all adverse evidence, and giving credit to all evidence that is favorable to the successful party and indulging every legitimate conclusion that is favorable to him, a jury might have found in his favor, then it is to be concluded that there is evidence to support the verdict." Moreover, if there is any evidence of probative value to support a jury verdict, it is the duty of the appellate court to uphold it. See Young v. Fitts, Tex.Civ.App., 183 S.W.2d 186; Clark v. National Life & Accident Ins. Co., 145 Tex. 575, 200 S.W.2d 820. It is equally true that when the testimony is conflicting on a question of fact, the appellate court will not disturb the verdict of the jury when there is competent evidence to support the findings; and it is immaterial that the trial judge and the appellate court might have arrived at a different conclusion in passing upon the conflicting evidence. See 3 Tex. Jur. 1096, secs. 768, 769 and authorities there collated. See also Vol. 4, Texas Digest, Appeal and Error, ☞☜999(1) and 1001(2). See also Insurance Company of North America v. Cangelosi, Tex.Civ.App., 217 S.W.2d 888, points 1-3.

450

Appellant's points 11, 12 and 13 assign error because the court permitted appellee, over its objection, to testify to the statement he made to the engineer and fireman, to-wit: "After it throwed me down twice I told the fireman there was something wrong with this engine. I couldn't get what he said, but he laughed, and I told him, 'I am going to get back here and ride on the sand box.'" Appellant says that such testimony was hearsay, voluntary and self-serving on the part of plaintiff and not binding upon defendant; that since such statement was made over an hour before the derailment it has no probative value; and since such statement was practically the only proof of negligence offered to show the defective condition of the engine, it is highly prejudicial, and for such reason this cause should be reversed and remanded. We overrule these contentions.

In defendant's first amended original answer on which it went to trial it pleaded certain written rules and regulations in force for its employees operating the trains, the provisions of which were well known to appellee, binding on him and appellant, and pleaded in effect that it was the duty of plaintiff to exercise ordinary care for his own safety; that appellee was guilty of negligence in not exercising ordinary care for his own safety in that he failed to call the attention of the conductor and/or the engineer to the dangerous rate of speed of the train (which was expressly denied by defendant), and that he was further guilty of negligence in failing to comply with the written rules of the company in not causing the speed of the train to be reduced; that such specific acts of negligence were jointly and severally the proximate cause of the injury and damage to plaintiff and if he should be permitted to recover that his recovery should be reduced in proportion to his contributory negligence. Rule 887 of the pleaded rules provides in part: "In cases where safety of trains and observance of rules or train orders are involved, brakemen are responsible to the extent of their ability to prevent accident or violation of rules." Rule 889 provides: "Trainmen must know by speed of train, grade, or caboose air guage, that train is being handled safely and under control, and, when necessary, take immediate action to get train under safe control."

Under the applicable law and the above rules it was the brakeman's duty, in the exercise of ordinary care for his own safety, to call the attention of the engineer and fireman to any operation of the train that seemed dangerous, and the testimony was admissible on the issue of contributory negligence pleaded against him. Needless, to say, we do not think the testimony was hearsay. See 17 Tex.Jur., sec. 210, p. 519. Since defendant's witnesses all testified to the effect that the slack between the engine and tender referred to in the inspection reports and rough riding of the engine had nothing to do with the safety of its operation, we think the testimony was admissible on this phase of the case. The testimony may have been admissible under the doctrine announced by our Supreme Court in Houston Oxygen Co. v. Davis, 139 Tex. 1, 161 S.W.2d 474, points 5-6, page 476, 140 A.L.R. 868. If we are mistaken in either of the above reasons, such error comes under the harmless error rule. See Rule 434, par. 2, T.R.C.P.

Appellant's 10th point in effect is that the jury's award of $25,000.00 was so manifestly excessive as to indicate improper motive on the part of the jury. The size of the award requires a comprehensive statement. It is our duty to view the evidence from the standpoint most favorable to appellee and we must bear in mind that the testimony of the medical witnesses is only evidentiary and is never binding upon the trier of facts. See Hood v. Texas Indemnity Ins. Co., 146 Tex. 522, 209 S.W. 2d 345, 346, points 1-3; and for further collation of authorities see opinion of this court in Aetna Ins. Co. v. Isensee, 211 S. W.2d 613, and cases collated on page 622 thereof; also the applicable law previously stated in our discussion under Points 3, 4 and 5.

On the trial the nature of the work of the freight brakeman was made by counsel for the railroad company as follows: "I think the facts will be admitted, no dispute about it, that Mr. Brown (plaintiff) for several years, maybe 8 or 10, was a

railroad brakeman, and as far as I know, was always engaged in the service as a brakeman on a freight train, which requires extreme exertion. You have to get on rapidly moving trains or cars, you have to climb ladders along the side of cars, and you have to walk along the tops of trains, when they are in movement; you have to get off, or disembark from moving trains at different places, where the ground is not always regular, and particularly fitted for that. And in addition to that, they have at the tops of cars a brake wheel, which sometimes requires great exertion to put the brake on by the use of hands and force. In other words, it is a character of work that requires agility and straining and great activity."

Appellee testified in detail as to the labor he was able to perform prior to the time he went to work for the railroad company; that such work is ordinarily termed "heavy work" and required one to be well and strong in order to perform such tasks and that he had been well and strong. Appellee said that at the time of the accident his back was against a grab iron at the top of the cupola of the caboose; that after he got out of the caboose he couldn't raise his left leg up; that it was paining him, and he couldn't move his back, couldn't use his muscles to get up and down, and that he held on to the catwalk around the cupola and worked himself around to the rear of the caboose. He said he stood on his feet so long because he couldn't sit down, he couldn't do anything but stand or lie down, and he knew if he got down he couldn't get up; that he had never had any pain in his back before he sustained the injury in question and that his back had never given him any trouble in doing the heavy work that he had been doing, had never laid off with it, or had any trouble at all. Plaintiff was taken by his wife in a car from the accident to a hospital in Waco and on the way to the hospital he was in such pain that he cried and told his wife he believed his back was broken. Mrs. Brown testified to the effect that when she saw him the next day at the hospital she thought he was paralyzed from the waist down because he couldn't move and that he made outcries of pain and groaned. He remained in the hospital at Waco for three days.

"Q. What was done for you at Hillcrest hospital, what treatment, if any? A. Not anything that I could tell, only lay there and rest, and they examined me.

"Q. Did you or not suffer any pain while you were there? A. Yes, sir.

"Q. What parts of your body did you suffer with? A. My back and muscles.

"Q. What part of your back? A. It felt alike all over it, when I moved it nearly killed me."

He was taken from Hillcrest hospital in Waco to the General Hospital for employees at Palestine in a railroad ambulance and remained there for about ten days.

"Q. During the time you were in the hospital at Palestine was any treatment given you? A. It was mostly just laying there. * * * Of course they took X-rays and all and kept a chart on me. If they did anything to me after taking the X-rays I don't remember it.

"Q. During the time you were in the Palestine hospital did you have any pain? A. Yes, sir.

"Q. What part of your body did you suffer with? A. My back, and this hand was sprung.

"Q. How did you rest at night during that time? A. I didn't have much rest.

"Q. Why? A. I was in pain."

That after being in the Palestine hospital for ten days they permitted him to go home; that the intern placed him in a wheel chair and wheeled him downstairs and placed him in a car and his wife took him home. When he got home he went to bed and remained there some three weeks; during this time he suffered pain in his back and muscles and that his hand was sore and that he had a sore place in the back of his neck; that after he got home, on account of pain and nervousness, he slept about three hours at a time; that after staying in bed at home some three weeks he found out he could get up and move around and he began to spend a little time up, and finally he got to where

he could sit up most of the morning. He said: "As soon as I found out I could get up and move I began to spend a little time up," and finally he got to where he could sit up most of the morning. He said: "As soon as I found out I could get up and move I began to spend a little time up, and finally as time rolled on I could sit up most of the morning, and from then on until not too far back, I would say up until two months ago, I stayed in bed from two to four hours every evening, mostly every evening.

"Q. What was the reason for that? A. That pain in my back.

"Q. Was there any difference in that pain when you would remain up and get about more than otherwise. A. Yes, sir.

"Q. What is that difference? A. Dr. Haverlah said I would never get any better if I didn't take exercise of some kind, and he said for me to do garden work, and if my back got to hurting too bad to go and lay down, and that is what I have done;" that he tried to do his garden work, "like planting it, and taking a hoe and opening a trench or something like that * * * and covering this seed and stuff like that, just anything I could do, but it would hurt me in here, and it hurt my leg; in other words, it pained me so when I would do that for an hour or so I would have to go in and go to bed.

"Q. How long would you remain in bed after doing that? A. It would be a good bit before the pain would subside, in fact, it never quit hurting, it was kind of a nagging pain in there all the time. * * I made a trip to Fort Worth, I don't remember what date it was, but I had to get up and walk on my legs, first one and the other tried to go to sleep on me and I had to get up and walk, and I spent most of the time standing with the rear brakeman; that was up there and back. * * * I figured if they were going to put me back to work I was going to see how I could stand it. On riding the train down there, and my back started to hurting and it got worse when I got there, and when I got back I had to go to bed. * * *

"Q. What sensation did you have riding on the train? A. It pained me in be-

tween my hips and I still had that leg going to sleep, it wasn't as bad as it used to be but it was still there, it makes you uncomfortable and it makes you kind of sick, that's the way it affected me."

Other witnesses testified to the effect that in visiting in the home of appellee, after he received his injuries, he looked as if he were suffering pain.

Much medical testimony was tendered in this cause. An X-ray specialist who made some pictures of appellee testified to the effect that he made pictures of appellee's back. He said that his examination reflected a pressure on the disc that would cause a nervous condition in the leg because finding anything in that region causes pressure and it will result in symptoms such as appellee had; that the fifth lumbar has slid forward a little on the sacrum filling up the back margin of the sacrum and that this condition is known as spondylolisthesis, which condition was caused by failure of the lower part of the pedicle to unite with the upper part so that the solid bone is united with a piece of cartilage and that the cartilage produced a weak point; that this process is one that began at birth through a faulty juncture of the bone with the pedicle and that while it is true that somewhere during the development of the individual, if it has not already slipped, it is going to slip sooner or later, but it is possible that such person can go on and die a normal death without it slipping, and that no one can tell the exact time of the slip; that such condition would cause a man to have a weakened back or have a condition that would be more subject to injury than without, and that a man with such condition is a little more susceptible to injury.

Another medical witness, a specialist in disorders of the nervous system, examined plaintiff on August 13, 1948, (this cause was tried in December, 1948) and he testified to the effect that he found that there was an absence of the right ankle jerk; that plaintiff had some difficulty in completely flexing his right hip and extending the leg with the hip flexed, and also found some minor muscle spasms in the lower back. He also found this displacement of the vertebra and said you could get such a displaced vertebra by a trauma or injury. To a hypo-

thetical question he answered that the plaintiff's condition of spondylolisthesis was caused either by an accident or it was caused to be aggravated to such a degree that it caused pain, if it had not produced pain theretofore. With reference to the type of work plaintiff could do he said: "Well, I would say that it would be better to avoid any activities which cause any strain upon the back such as heavy lifting or a sudden twist in any direction. Q. Doctor, as to the conditions you found there, and taken in connection with the conditions I have asked you to assume, what is your opinion as to the probable permanency of these things? A. I believe it will stay just about the way it is now. Of course I would say this: That from the symptometology of an injury involving the disc are very variable. At times they will get extremely bad, such as a bad sciatica. Other times they will clear up almost completely."

Another specialist testified that he examined the appellee; that he did laboratory studies and made X-ray pictures of the spine and further testified that he found some objective physical findings that indicated to him that the appellee did have pain in his back. He said: "There was muscle spasm present with movement of the spine. There was an absence of right heel cord reflex, and there was profuse tenderness over the fifth lumbar spinous process. * * * It is probably true that a person could have spasms without pain." He further stated: "If I would say that an injury definitely aggravated this situation I am only guessing because I don't know what his spine looked like before that time. * * * I know it was congenital; there was no question but that it was a congenital condition that he has had all of his life. * * *

"Q. In your opinion, Doctor, is there any involvement of the intervertebral discs in this clinical picture that you have of this man such as a dislocation or misplaced disc? A. There was no dislocation. There was no displacement of any of his discs. The discs between the fifth lumbar and the sacrum is put upon a strain when a forward slipping of the fifth lumbar occurs.

"Q. That is a condition that causes a back that is not as strong as when he doesn't have it; is that true? A. Any individual that has a spondylolisthesis has a congenital weak back, a back that is more easily injured than a normal back would be."

Another specialist made an examination of the patient in September before the trial in December and took a history of his case and his symptoms and he made a physical examination of his head, neck, lungs, reflexes, urinalysis, etc., and had the benefit of the X-ray pictures. He found his ankle reflexes normal and said there was nothing in his examination, except the pictures showing an abnormality, to prevent this man from doing the work he was qualified to do at the time he examined him; that from past experience and from the examination he thought the patient could do most all of the things that an ordinary man could do. He said his back would give him trouble if he did heavy lifting; or if he did heavy work, like digging ditches, he would probably complain of pain in his back; that plaintiff had a maximum disability of forty per cent.

Dr. Harry Haverlah, a specialist and in charge of defendant's hospital at Palestine, had an opportunity to examine the patient and observe him while he was a patient at the hospital in Palestine; that he made the knee, ankle, Rubinsky and Rhomberg tests. "He had what we call a spinabifide. That's fat that covers the back of the backbone that is not completely fused and there is openings in it, and also there is some slight shifting of the fifth lumbar forward which is a condition that is known as spondylolisthesis, but most of those things, they are things that make up what we call a congenital weak back; in other words, a person is born with those conditions. He has what we consider a weaker back than a normal individual." He further testified:

"Q. In his report to you from time to time did he continue to complain of pain or was he some times better and some times worse? A. He complained of some pain on nearly every visit when he came to the hospital. At times he complained of more

pain than at other times, but some days he said he felt better, and occasionally he said he felt good enough that he felt like going to work, and maybe he would do a little something, or walk a little more that day and he said he would have pain the next day.

"Q. Do you remember when you examined him the last time? A. No, sir; it was along about the 3rd or 4th of September.

"Q. Assuming he got hurt in this accident, in this derailment and had some injury to his back, tell the jury whether or not in your opinion he has fully recovered from that injury at this time? A. At this time I do not know. When I saw him in September and talked to him—at that time I think he had been off from December to September, which I told him was longer than these cases ordinarily required to get well, and up until September he had definitely maintained he had too much pain to try to return to work, and I questioned him at all times and told him he would be able to go back and resume his job as a brakeman, that I saw no reason why he couldn't. The last time I saw him, on September 3rd or 4th, he said at that time he had too much pain to return to work, and I haven't seen him since. * * *

"Q. This pain he had in your judgment was it due to this congenital condition? A. You couldn't say it was all due to a congenital condition, he sustained an accident and I think a part of this pain is definitely attributed to the accident, but I think the condition of his back is prolonging his disability a great deal, and I still think eventually he will recover sufficiently to resume his former employment as a brakeman. I would say within six or eight months ordinarily should be sufficient disability for that type of injury.

"Q. So far as anything you could find in the way of objective symptoms, and what you found and what the X-rays showed, is it your opinion he can resume his position as a freight brakeman at this time? A. Yes, sir.

"Q. Anything you found there would it indicate he would be permanently disabled in doing that character of work in the future? A. I don't think I found anything that would indicate any permanent disability whatsoever."

He said he found no broken bones or severed muscles or ligaments.

"Q. When he first came there was some tenderness in his back? A. Yes, sir, there was some tenderness in his back, particularly on the left side where the hip bone and back bone grow together. He had quite a bit of tenderness when he was first admitted to the hospital."

 It was without dispute that appellee's earnings for the year 1946 averaged $410.07 per month. The accident occurred on December 7, 1947, and for the first eleven months of 1947 he averaged $410.74 per month. For the first seven days of December he made $143.82, or $20.55 per day. There had been an increase in the rate of pay since plaintiff was hurt. Testimony was tendered to the effect that appellee was able to serve as brakeman on a passenger train and that this work was much lighter than the work of a freight brakeman. Evidence was also tendered to the effect that a passenger brakeman would earn approximately $182.00 per month less in working than a freight brakeman. This of itself would be a total loss per year of $2584.00. At the time of the trial plaintiff had already lost one full year's wages, which normally would be approximately $5000.00. This would leave a remaining amount of $20,000.00 to be accounted for. Taking the trainmaster's estimate of the difference in the wages earned by a freight brakeman and a passenger brakeman, it will be seen that appellee's losses would be substantial each year and that in less than eight years such loss would amount to more than $20,000.00. It was the jury's duty to reconcile, if possible, the contradictory statements as to the injuries sustained by plaintiff and award to him such damages as they thought he was entitled to receive based upon such injuries and his loss of earnings. This sum they fixed at $25,000.00 and we cannot say that it is excessive, nor that it indicates improper motive. See Pure Oil Co. v. Crabb, Tex.Civ.App., 151 S.W.2d 962, point 6 and authorities there collated. Also Texas & P. R. Co. v. Riley, Tex.Civ.

App., 183 S.W.2d 991, writ ref., certiorari denied, 325 U.S. 873, 65 S.Ct. 1414, 89 L. Ed. 1991; International-Great Northern R. Co. v. Hawthorne, Tex.Civ.App., 90 S.W.2d 895, affirmed 131 Tex. 622, 116 S.W.2d 1056, Id., 306 U.S. 639, 59 S.Ct. 487, 83 L. Ed. 1040; Kansas City So. Ry. Co. v. Chandler, Tex.Civ.App., 192 S.W.2d 304, writ ref. N.R.E.; El Paso Electric Co. v. Gregston, Tex.Civ.App., 170 S.W.2d 515; International-Great Northern R. Co. v. Lowry, 132 Tex. 272, 121 S.W.2d 585.

Finding no reversible error, the judgment of the trial court is affirmed.