**DALLAS RAILWAY & TERMINAL COMPANY, Appellant,**

v.

**Mrs. E. E. TUCKER, Appellee.**

No. 3258.

Court of Civil Appeals of Texas.

Waco.

May 26, 1955.

Rehearing Denied June 23, 1955.

one of defendant's passenger cars and alleged substantially that the wrongful and negligent conduct of the agent of defendant in attempting to eject passenger E. E. Tucker from the car resulted in his death and the resulting damages to his widow and to his estate.

The jury in its verdict found substantially that defendant's operator of the car used more force than was reasonably necessary in ejecting the deceased, and that such conduct was negligence and was a proximate cause of the fatal injuries to Tucker, and that defendant's operator committed an assault and battery upon the deceased, and that such assault was a proximate cause of the fatal injuries sustained by passenger Tucker; that the failure of defendant's student operator to protect the passenger Tucker in the difficulty with defendant's operator was negligence, and that such negligence was a proximate cause of the fatal injuries to Tucker; that the failure of the student operator to separate Tucker and defendant's motorman was negligence, and that such negligence was a proximate cause of the fatal injuries to Tucker; that the failure of the motorman to call the police of the City before evicting Tucker from the street car was negligence, and that such negligence was a proximate cause of the fatal injuries to Tucker; that immediately before Tucker was knocked down, he, Tucker, was in a position of peril, and that the student operator saw Tucker and realized that Tucker was in a position of peril and that the operator saw him in time so that, in the use of all the means at hand, he could have, with safety to himself and to said street car and passengers thereon, prevented Tucker from being knocked from said street car, and that the student operator, after he saw and realized that Tucker was in a position of peril, failed to exercise a high degree of care to use all the means at hand to prevent Tucker from being injured, and that such failure to exercise such high degree of care was a proximate cause of the injuries and death of Tucker; and that the operator of defendant's car saw Tucker and realized that he was in a position of

Burford, Ryburn, Hincks & Ford, Clarence A. Guittard, Joseph M. Stuhl, Dallas, for appellant.

Gallagher, Francis, Bean, Berry & Wilson, Williams & Akin, Dallas, for appellee.

TIREY, Justice.

This is a negligence case. Plaintiffs grounded their cause of action on the negligence of the agent of defendant operating

peril in time so that, in the use of all the means at hand, he could have, with safety to himself, the street car and the passengers, prevented Tucker from being knocked from the street car, and that the operator of defendant's street car failed to exercise a high degree of care to use all the means at hand to prevent Tucker from being injured, and that such failure was a proximate cause of the injuries and death of Tucker; that Tucker was not in a state of partial or complete intoxication; that defendant's operator at the time he struck Tucker was not acting in self defense; that at the time defendant's operator struck Tucker it did not reasonably appear to him, viewed from his standpoint at the time, that Tucker was about to make a physical attack upon him; that at the time and on the occasion in question Tucker was guilty of disorderly or offensive conduct on the car and that Tucker used violent, profane, obscene and abusive language toward the operator, and that the use of such language by Tucker was negligence, but found that such negligence was not a proximate cause of the injuries sustained by Tucker; that the operator of the car did not request Tucker to leave the street car; that Tucker was not negligent in resisting the efforts of the operator to remove him from the street car; that defendant's operator Talley was not confronted with an emergency at the time in question; that defendant's operator Walker was not confronted by an emergency.

The jury awarded to Mrs. E. E. Tucker for her pecuniary loss the sum of $21,500. The jury fixed doctors' bills reasonably incurred at $450, hospital bills at $200, and reasonable funeral expenses at $390. On motion for new trial the court ordered a remittitur of $2,750, which plaintiff filed, and thereafter the court entered judgment in accord with the verdict of the jury. Defendant seasonably perfected its appeal and the cause is here on transfer order entered by our Supreme Court.

The judgment is assailed on four points. We state them substantially: (1) The trial court erred in charging the jury that defendant's employees were under a duty to exercise a high degree of care in evicting Tucker from the street car; (2) in overruling its motion for new trial made on the ground of improper jury argument by plaintiff's counsel; (3) in overruling defendant's objection to improper jury argument made by plaintiff's counsel; and (4) in overruling its motion for new trial based on the excessiveness of the damages awarded in the verdict.

Appellee's counterpoints are substantially that the (1) court correctly charged the jury that defendant's employees were under a duty to exercise a high degree of care in evicting Tucker from the street car; (2 and 3) that the court correctly overruled defendant's motion for new trial based on jury argument of plaintiff's counsel; and (4) the court correctly overruled defendant's motion for new trial based on the alleged excessiveness of the damages awarded in the verdict. Appellee filed cross point to the effect that the court erred in requiring her to file a remittitur.

Did the trial court in its charge place a greater burden on appellant than it was required to bear? Our view is that under all of the facts and surrounding circumstances it did not. The point requires a comprehensive statement.

Going back to the court's charge we find:

"By the term 'high degree of care' as used in this charge, is meant that degree of care (that) would be exercised by a very cautious and prudent person under the same or similar circumstances.

"By the term 'ordinary care' as used in this charge, is meant that degree of care that would be exercised by a person of ordinary prudence under the same or similar circumstances.

"By the term 'negligence' as used in Special Issues Nos. 2, 6, 8 and 13 is meant a failure to exercise a high degree of care as that term is defined herein.

"By the term 'negligence' as used in Special Issues Nos. 27, 30 and 32 is meant a failure to exercise ordinary care as that term is defined herein.

"You are instructed that a person is in a 'position of peril' when he is in danger of serious bodily injury or death, and it reasonably appears from the circumstances that he cannot or will not be able to extricate himself therefrom.

"You are instructed that a person is acting in self-defense when he has a reasonable apprehension that he is in danger of bodily injury from another person, and it is not necessary that there be actual danger, provided that the person defending himself acts upon a reasonable apprehension of danger as it appears to him, and provided that he uses no more force than reasonably appears to him to be necessary.

"By the term 'emergency', as used in this charge, is meant a condition arising suddenly and unexpectedly and not proximately caused by the failure, if any, on the part of either the student operator or the operator of the defendant's street car. (written in) to use a high degree of care."

In appellant's brief we find this statement:

"The trial court placed defendant under an impossible burden by holding in effect that defendant's employees must use a high degree of care in ejecting a disorderly and offensive person, whose ejection is necessary in fulfilling defendant's duty to protect other passengers from the conduct of such a person. The very duty which is imposed on the operator of a public conveyance to use a high degree of care for the protection of the rest of his passengers is practically, if not logically, inconsistent with a duty to exercise the same degree of care in removing a disorderly person. The operator's first thought must be for the rest of his passengers. If he does his duty to use ex-

traordinary caution and prudence in protecting them from inconvenience, insults, and possible injury, he must sometimes take action which might not be considered extraordinarily cautious and prudent when viewed from the standpoint of the person whose disorderly and offensive conduct has invoked that duty."

We think appellant's statement is not applicable to the testimony here tendered, nor to the verdict of the jury thereon.

Appellant relies on the statement of the rule found in 10 Amer.Jur. 321:

"A carrier of passengers has the right, and it frequently becomes its duty, to enforce order and decency upon its conveyances or premises by expelling therefrom those who are disorderly, obscene and dangerous in their conduct. The actual commission of a disorderly act is not a prerequisite to the expulsion of such a person from the property of the carrier. It is sufficient if his conduct is so offensive or disorderly as to warrant the inference that annoyance or discomfort is likely to result therefrom."

Appellant also relies on Texas & P. Ry. Co. v. Storey, 37 Tex.Civ.App. 156, 83 S.W. 852, er. ref.; Atchison, T. & S. F. Ry. Co. v. Wood, Tex.Civ.App., 77 S.W. 964, no writ history; Galveston, H. & S. A. Ry. Co. v. Long, 13 Tex.Civ.App. 664, 36 S.W. 485, no writ history; Williamson v. Chicago, R. I. & G. Ry. Co., 57 Tex.Civ. App. 502, 122 S.W. 897, no writ history; Fort Worth & D. C. Ry. Co. v. Gribble, 46 Tex.Civ.App. 78, 102 S.W. 157, no writ history; Galveston, H. & S. A. Ry. Co. v. Lester, 24 Tex.Civ.App. 467, 59 S.W. 946, er. ref.

■ We have read very carefully the evidence tendered and the authorities of appellant and it is our view that the trial court, by its charge, did not impose a greater burden on appellant than it was required to bear. Since the jury's verdict was favorable to appellee, it is our duty to con-

sider the evidence tendered in the light most favorable to her to support the findings made by the jury.

Appellee tendered testimony to the effect that Tucker's face had some very bad bruises; that they were blue and purplish; that they started at the hair line back of his ear going down underneath his chin; that there were indications that he had been bleeding from the eyes and there was a trickle of blood on his mouth; that both sides of his face were prominently marked; that one of the bruises on the left side was approximately the size of a silver dollar or larger and that the one on the right side was quite large; that there was a sign that blood had trickled from his eyes and right outside the ear; that Mr. Tucker was taken to Parkland Hospital, where he received first aid, and later the same evening he was taken to St. Paul's Hospital. Dr. Kirksey testified to the effect that when he saw him that night following the afternoon of his accident that Tucker was breathing loud with a snore; that his face was pretty well marked up with reddish discolorations; "Q. About how many of those areas did you see of those reddish discolorations? A. I don't recall but one was about one of his eyes," and that it seemed to him that it was the right eye; that he saw Tucker one other time and advised them at that time that he thought it was a case for a specialist; " * * * I felt sure the man had had a hemorrhage and if they knew a neurosurgeon, they should call him in. I was talking to the family when I said that."

Evidence was tendered to the effect: "Q. I will ask you to state whether or not you saw anything in the motorman's hand when he hit the old man? A. The last time he hit the man and knocked him—the last time he did have the punch in his hand. I couldn't see if he struck him with it or not, but he had the transfer punch in his hand."

Evidence was also tendered to the effect that Tucker was 64 years old, and that he was well and strong and vigorous and was a carpenter and was gainfully employed.

Robert Talley, the operator (age 36), testified in part and substantially as follows: That he saw Mr. Tucker approaching the car and that he walked "like a man heavily under the influence of drink;" that he was smoking when he came in the car and he asked him to put out his cigarette; that there is a "no smoking" sign on all street cars and buses and there was one on that car; that when Tucker got on the car he was mumbling and after he rode a block he handed the bus fare to him and he told him to go ahead and drop it in the box; that Tucker replied, "All these operators are just smart operators out here, trying to take over and run things here; here's your 15¢, just drop it in yourself;" that after he started to the next corner Tucker kept mumbling and cursing; that he kept saying "all operators were God damn smart operators, first one thing and another like that * * * and I asked him not to use that profanity on the street car because the car was crowded" with both colored and white persons; that when Tucker entered the car he entered on the "exit" side of the front door and that such door is divided into two sides, one to enter and one for exit, and that the entire car was crowded, including the vestibule; that there was a rod between the place where Tucker was standing and where two women were sitting; that when he stopped at the next corner Tucker had to step out on the lower steps to let passengers off and he came back in and said, "I was a smart son of a bitch * * * I told him that I would like for him to be quiet; there were women and other passengers on there and there were some children on the car too, and I told him I would like for him to be quiet so we could go on down the street. I didn't want to cause any trouble and I didn't want any trouble with him;" that Tucker said "O. K."; that when he started off for the next corner Tucker mumbled and cursed all the way down about operators; that Tucker seemed to be angry all the time; that when he stopped at the next corner Tucker had to step back on the lower step in order to let some people out and I asked him "a little more plainer to please be quiet"; that Tucker said he would

be quiet and "I told him he could ride if he would be quiet, to come on in and ride; * * * Q. Did he remain quiet while you were going the next block? A. He mumbled all the way down there, cursing and raising Cain;" that he didn't use any bad language toward Tucker; that when he got to the next corner Tucker again stepped back down on the step to let passengers out, "and he come back in the car that time and I told him he was going to have to be quiet if he stayed on the street car, and he said * * * he wanted to go to Fizhugh and Haskell and I told him, 'Well, you can ride down there if you will be quiet, but if you are not quiet you are going to have to leave the car,' and he said, 'Okay, I will be quiet';" that Tucker got back on the inside and after he got the car started and got well into the intersection Tucker said, "I will be quiet when I want to. You go on and run the street car you smart son of a bitch; * * * I ran the car on to the next corner and I didn't say a word;" that when he got there he opened the front door and stepped back and caught Tucker under the arm and started out the front door with him; that when he caught him under the arm and turned and started out the door, Tucker whirled back and hit him right above the eyes, just hit his glasses but did not knock his glasses off; that he didn't notice it so much at the time but that his head was sore two or three days later; that after Tucker hit him "there was more or less a scuffle until I got just inside of the car and he tried to kick me and I blocked the kick with the exit gate; * * * and I straightened up and I hit him;" that he hit him with his right fist; that he had nothing in his hand; that he hit him in the eye, right on the edge on the eye, and the nose; that when he hit him "he was holding with both hands there and just as I hit him he fell back on the pavement, just set down straight out on the pavement. * * *

"Q. When you hit him did you have any other way of getting him off the car? A. Well, I don't know as I had any other way of getting him off the car. It was either hit him or be

hit some more. That is the way it looked to me.

"Q. Were you hitting him—were you afraid of being hit by him? A. Yes, sir, very much.

"Q. Why were you afraid? A. He was a larger man and he had been drinking and acting mad all the way down those blocks, and he swung and hit me first there, and was still fighting, so it was—I figured it was time for me to kind of protect myself;"

that Tucker fell in the street and he seemed to be unconscious so "I drug him over to the side there, just pulled him out of the street where cars wouldn't run over him. * * *

"Q. What was on your mind then, Mr. Talley, when you considered calling the police? A. When I considered getting him off of there, if I could get him off quiet and gentle onto the pavement, I would go on with my run. It would be less trouble to everybody and he wouldn't be involved in anything and I wouldn't either if I could get him off there peaceful and quiet.

"Q. When you took him by the arm to get him off, did you think you could get him off peacefully? A. I thought maybe that I could.

"Q. You say the old man got mad. You got mad too, didn't you? A. In a way, yes.

"Q. And you were the first one who laid hands on him, before he ever touched you. * * * I just caught his arm to take him out. I didn't strike him.

"Q. You put your hands on him first before he ever hit you, didn't you? A. Yes, sir.

"Q. * * * Did you put both hands on him and were going to take him out of the street car? A. Yes, sir. * * *

"Q. You never did ask him to get off; you grabbed him by the arm and started taking him off, didn't you? A. That is right.

"Q. And you got plenty mad at that time, didn't you? A. No sir.

"Q. Well, when you got mad, was it before then? A. Yes, sir. * * *

"Q. And your reasons for not calling the police was what? A. I didn't want to cause him any trouble. * * * I didn't want him to go to jail. * * *

"Q. You claim all these black and blue places all on his face, you gave with just one punch? A. I hit him once.

"Q. Then he had both hands on that rail? This big powerful man, and you knocked him off with that one blow, with nothing in your hands? A. That is right. * * *"

that Tucker did have both hands on the bar but he turned one of them loose and then fell back and the door was open to the street car;

"Q. You knew that was the proper time to hit, when his hands were on that bar and his face unprotected, that man you say was drinking? A. Like in boxing, when he is coming back fighting, there wasn't any choice. I hit him when he came.

"Q. He wasn't coming back with his hands on the rod, don't you know that all he was doing there was trying to stay on that street car? He wasn't trying to attack you, isn't that right? A. He had been. * * *

"Q. You knew at that time when you hit him that blow with his hands on that rail and his face unprotected that was dangerous, didn't you? You knew you would do him harm? A. I didn't figure I would kill him.

"Q. You intended to knock him off the street car when you hit him? A. No, sir, I was protecting myself.

"Q. Then you hit him because you were mad too, weren't you? A. I wasn't mad at him, no sir.

"Q. I thought you said you were mad? A. I was mad back up the street.

"Q. You were still mad when you hit him, weren't you? A. No sir.

"Q. When did you get calm and get over the mad spell? A. After he called me what he did the last time, I run that street car nearly a hundred yards before I stopped."

Mr. Talley further testified: "Q. * * You and the operator could have easily put the man off the street car without you killing him, couldn't you? You know that, and you so testified in your deposition, didn't you, that you could both have put him off, isn't that right? A. I could put him off? Yes, sir."

Walker, the student operator, testified to the effect that he was about 21 years old, six feet three, and weighed 180 pounds; that he was standing to the left and back of the operator; that he saw Mr. Talley take hold of Tucker's left arm with both of his hands and try to take him off of the car; that there was some scuffle and that Tucker hit Talley; that he (Walker) tried to take off Talley's glasses but failed; that Mr. Talley did not hit Mr. Tucker until after Tucker had struck Talley; that he did not recall seeing Talley hit but one lick; that Tucker had hold of the rail with both hands when Talley struck him and that Talley struck Tucker in the left eye and he fell out on the concrete on his back; that when Tucker hit the ground he did not move and his eyes were closed and he supposed he was unconscious. Walker's explanation as to why he did not assist Talley was that Talley did not ask him to help; that he had never seen anything like that before and that it happened very quickly; that the entire scuffle and fight did not last more than 30 seconds. Mr. Walker further testified:

"Q. Now, Mr. Walker, you and Mr. Talley could have easily taken this old

gentleman off the street car, couldn't you, and you have so testified in your deposition? A. We could have taken him off. I don't know how easy it would be.

"Q. You didn't make any effort to protect Mr. Tucker from this attack, did you? A. No, sir."

It is true that the evidence is without dispute that Tucker had been guilty of the use of abusive language after he became a passenger and had been requested by the operator to be quiet and to cease the use of the abusive language and that Tucker had promised to be quiet, and he did cease when the car stopped but began the use of such abusive language again when the car started; however, no testimony was tendered to the effect that Tucker had been guilty of any misconduct or the use of abusive language immediately before the car stopped at the fifth block, or while it was stopped there, at which time the operator had definitely made up his mind to eject Tucker, and Talley said that he had run the last 100 yards without saying anything to Tucker, and there is an absence of testimony as to whether Tucker had said anything to Talley while the car was going this 100 yards. Although Tucker had started using abusive language after the car had gotten started after the discharge of passengers at each of the four stops made after he boarded the car, however since he had not said anything for a distance of 100 yards the operator could not assume that Tucker would again use abusive language after the discharge of the passengers at the fifth stop and after the starting of the car. That would be building one presumption upon another, which he was not authorized to do.

The evidence is without dispute that Tucker was standing in the crowded vestibule, holding onto a rod, when the operator stopped the car and caught Tucker's left arm with both hands and began to put him off; that the operator did not ask Tucker to leave the car peacefully at that time, or tender back his fare, but undertook to put him off by force and this re-

sulted in the scuffle and fight. Moreover, the appellee's testimony as to the fight is contradictory in part to the story detailed by the operator and the student operator.

Betty Williams testified in part:

"Q. What first called your attention to this? A. Well, in fact, I was sitting facing the door and I just seen the street car when it stopped there, but what attracted my attention, the old man was holding on the rail at the door and the motorman was scuffling with him. I said, 'Look there, look there.' * * *

"Q. Then what did you see after you saw the scuffle? A. So when we all jumped up and ran to the door and he was wrestling with him trying to get his hands untwisted from holding that bar, that run up inside the street car and so, and then he started hitting him and he was holding onto the bar that runs down and looked like his legs was kind of wrapped around it too and the motorman kept hitting and he dropped back and hit him a hard one and then that is when he fell back on the pavement. * * *

"Q. Was the door of the street car open? A. Yes, the door was open. * * *

"Q. When he fell off the street car, when he was knocked off the street car, what part of his body hit the paved street? A. All parts, he just fell on his back flat stretched out and his head made a terrible sound when it hit the pavement. * * *

"Q. Now how many blows did you see the motorman hit? A. More than five or six blows. * * *

"Q. Well, what else did you see? A. Well, after he kept hitting him I told the girl named Ethel, 'If he keeps hitting that old man and knocks him off in the street he is going to kill him,' and as I said that he did hit him and knocked him backwards off the street car. * * *

"Q. Did it make any noise? A. Yes, it did. When his head hit the cement it sounded like a car backfiring, when his head hit the cement. * * *

"Q. What did you do then when that happened? A. Well, after he hit, I was standing out there so long, this motorman got off the street car and pulled Mr. Tucker by his arms, pulled him to the curb and then I told another girl to call the ambulance. I gave her a nickel to call the ambulance * * *."

It is true that some of defendant's witnesses testified to the effect that they smelled liquor on Tucker's breath when he entered the car and that his speech indicated that he was intoxicated; but some of appellee's witnesses testified to the effect that they were very close to Tucker immediately after he was knocked from the street car and that they were close enough to him to smell liquor on his breath if Tucker had been drinking and they did not. Dr. Kirksey, who attended him a few hours after he was injured, testified to the effect that he did not smell liquor on his breath. Testimony was also tendered to the effect that Tucker had bunions on his feet that interfered with his walking correctly and affected the way he walked, and the jury found that he was not partially or completely intoxicated.

In the early case of International and Great Northern Railroad Co. v. Halloren, 53 Tex. 46, 53, we find this statement of the rule: "Railroad companies, however, are not insurers of the safety of their passengers further than could be required by the exercise of such a high degree of foresight as to possible dangers, and such a high degree of prudence in guarding against them, as would be used by very cautious, prudent, and competent persons under similar circumstances."

In the case of International & G. N. R. Co. v. Welch, 86 Tex. 203, 204, 24 S.W. 390, 392, we find this statement of the rule: "* * * the law does not require everything to be done which might be foreseen, but only such as might appear to be nec-

essary, having that care for the safety of the passengers that a very prudent man would have, and to exercise that high degree of care that such man would exercise under the same circumstances." Our Supreme Court has not seen fit to change this general rule and we think it is applicable here. See Gulf, C. & S. F. Ry. Co. v. Conley, 113 Tex. 472, 260 S.W. 561, pt. 3, 32 A.L.R. 1183.

■ Under the record here made, and in the light of the foregoing rule announced by our Supreme Court, it is our view that it was the duty of appellant's employees in charge of the street car to exercise that high degree of care to avoid injuring E. E. Tucker which a very cautious and prudent person would have exercised under the same circumstances, and that the court did not impose a greater burden on appellant than it was required to bear. See also St. Louis Southwestern Ry. Co. v. Johnson, 29 Tex.Civ.App. 184, 68 S.W. 58, writ ref.; Galveston, H. & S. A. Ry. Co. v. LaPrelle, 27 Tex.Civ.App. 496, 65 S.W. 488, writ ref.; Gulf, C. & S. F. Ry. Co. v. Dunman, Tex.Com.App., 27 S.W.2d 116, 72 A. L.R. 90; Sunset Motor Lines v. Blasingame, Tex.Civ.App., 245 S.W.2d 288, writ dis.; Dallas Ry. & Terminal Co. v. Orr, Tex.Civ.App., 210 S.W.2d 863; Id., 147 Tex. 383, 215 S.W.2d 862; Gray County Gas Co. v. Oldham, Tex.Civ.App., 238 S.W.2d 596, no writ history; Louisiana & A. Ry. Co. v. Chapin, Tex.Civ.App., 225 S.W.2d 614, writ ref.; Dallas Consolidated Electric Street Ry. Co. v. Pettit, 47 Tex.Civ.App. 354, 105 S.W. 42, no writ history; Gary v. Gulf, C. & S. F. Ry. Co., 17 Tex.Civ.App., 129, 42 S.W. 576.

Appellant's points 2 and 3 complain of improper jury argument made by plaintiff's counsel. We have given our most careful consideration to each of these points. The argument complained of has been transcribed in full and we have read it and each of the bills of exception carefully. After a careful consideration of the testimony here tendered, and being of the view that the court did not err in its charge to the jury, we are of the further view

that the argument of counsel does not present reversible error and points 2 and 3 are each overruled. See King v. Federal Underwriters Exchange, 144 Tex. 531, 191 S.W.2d 855; Davis v. Hill, Tex.Com.App., 298 S.W. 526; Fauth v. First National Bank, Tex.Civ.App., 214 S.W.2d 168, no writ history; Wade v. Texas Employers Ins. Ass'n, 150 Tex. 557, 244 S.W.2d 197; Texas Employers Ins. Ass'n v. Haywood, Tex., 266 S.W.2d 856. See also Rule 434, Texas Rules of Civil Procedure.

Appellant's fourth point assails the judgment on the ground that the damages awarded are excessive. As stated by appellant in its brief: "On motion for new trial, the trial court ordered a remittitur of $2750.00, which plaintiff filed * * *." The court submitted the damage issue in this manner:

"What sum of money, if any, do you find from a preponderance of the evidence, if paid now in cash, would reasonably compensate plaintiff, Mrs. E. E. Tucker, for her pecuniary loss, if any, as a proximate result of the death of her husband, E. E. Tucker?"

In connection with the issue the court instructed the jury:

"In arriving at and determining your answer to the above issue, you may take into consideration and allow the plaintiff * * * whatever sum of money, if any, if paid now, would represent the value of what she had a reasonable expectation under the circumstances, of receiving from the earnings of her said husband. * * * However, you are instructed that in arriving at and allowing damages, if any, to the plaintiff, * * * You must not take into consideration nor allow her any sum as compensation for her bereavement, mental anguish, or pain suffered by her by reason of the death of her said husband, but you can allow her any such damages, if any, as resulted in a pecuniary loss to her occasioned by his death. In arriving at and determining your answer to the

above issue, you may take into consideration loss of maintenance and support, if any, services, if any, contributions from his earnings, if any, care and counsel, if any, that the plaintiff, Mrs. E. E. Tucker, would, if she would have, in reasonable probability received from her husband during his lifetime, had he lived. You must not take into consideration nor allow any sum to plaintiff * * * for her grief and sorrow suffered on account of her husband's death or loss of society, affection, companionship or physical and mental pain suffered by her said husband."

Neither the issue submitted nor the instruction given in connection therewith is here assailed. Evidence was tendered to the effect that Tucker's life work was that of a carpenter; that he was in good health and a steady worker; that he was vigorous and robust; that he was kind and devoted to his wife; that he worked five days per week, eight hours a day, and that he made $2.50 per hour, and never had to wait on a job as he always had another lined up after he finished the last one; that although Tucker was 64 years of age, he was very active and that he could do more work than young men; that Tucker had earned as much as $90 and $95 per week as foreman and had earned as much as $115 to $120 per week in that capacity. Testimony was also tendered to the effect that Tucker at times got up and fixed breakfast for his wife. His wife said he was her best friend. Testimony was also tendered to the effect that Tucker had a life expectancy of 12.11 years. It is appellee's position here that the jury's award to Mrs. Tucker for her pecuniary loss was inadequate and certainly not excessive. Appellee relies on the doctrine announced in Missouri Pac. Ry. Co. v. Lehmberg, Tex., 12 S.W. 838; also 33 Tex.Jur. 142, and 156; Houston & T. C. Ry. Co. v. Batchler, 37 Tex.Civ.App. 116, 83 S.W. 902, writ ref.; Texas & P. Ry. Co. v. Hagenloh, Tex.Civ.App., 241 S.W.2d 669, reversed on other grounds, 151 Tex. 191, 247 S.W.2d 236; Hemsell v. Summers, Tex. Civ.App., 138 S.W.2d 865; Hill & Hill

Truck Line, Inc., v. Van Schoubroek, Tex. Civ.App., 233 S.W.2d 167, no writ history.

Plaintiff in connection with her claim for damages introduced the income tax returns of her husband from 1946 to 1952 inclusive. The average income for these seven years was $1965.85. Appellant in its brief says in computing the damages in favor of a surviving wife for loss of support of her deceased husband, the facts to consider are: "(1) the probability that the deceased's earnings would decrease as he approached the end of his life expectancy; (2) the difference between salary and take-home pay; and (3) the fact that the wife would not receive the benefit of all of the husband's take-home pay since some of it is applied to his own support." They cite Thompson v. Jason, Tex.Civ.App., 265 S.W.2d 920, writ ref. We have read the foregoing case very carefully and do not think it applicable or controlling on the point here under consideration. On the contrary, we believe that our view as expressed in Texas & N. O. Ry. Co. v. Pool, Tex.Civ.App., 263 S.W. 2d 582, no writ history, pt. 13, on page 591, answers appellant's contention adversely.

Moreover, 12.11 years expectancy is that of the average person. The record here is that deceased was a strong, vigorous man, and under the testimony the jury would have a right to believe that Tucker would have lived beyond the expectancy of 12.11 years. Going back to the instructions in the charge, if the jury were of the view that Tucker, but for his injuries, would have lived some years longer than his expectancy, and if they had further believed his care and counsel to his wife would have had some material value, they had a right to award such sum as they thought would be fair and reasonable as compensation for this loss, and the jury's estimate and award are not shown here to have been improperly arrived at. It was the jury's duty to reconcile, if possible, all of the evidence tendered as to the pecuniary loss sustained by Mrs. Tucker under the court's charge and to award to her such damages as they thought would compensate her for her loss under the instructions given to them by the

court. See Thompson v. Brown, Tex.Civ. App., 222 S.W.2d 442, pt. 15, at page 454, no writ history. We do not believe that the appellant has carried its burden of showing that the award by the jury is the result of either passion or prejudice.

We have carefully considered appellee's counterpoint and since the trial court is clothed with a wide discretion, we see no reason to overturn his order requiring a remittitur.

Because of the views expressed here, the judgment of the trial court is in all things affirmed.